# ROBERTSON *v.* CHAPMAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF NEBRASKA.

No. 255. Argued March 9, 12, 1894. — Decided April 2, 1894.

The evidence does not bring this case within the operation of the following
principles of law, laid down by the court in its opinion, namely :

(1) That an agent is precluded from taking advantage of his principal,
or from dealing with the property committed to his care in any
other capacity than as an agent, who is bound to subordinate his
own interests to those of his principal ;

(2) That an agent cannot directly or indirectly become the purchaser of
property of his principal, entrusted to him to sell, and cannot
maintain a title thus acquired as against his principal ; for, in so
purchasing, his duty and his interest would come in conflict ;

(3) That if an agent to sell effects a sale to himself, under the cover of
the name of another person, he becomes, in respect to the prop-
erty, a trustee for the principal, and, at the election of the latter,
seasonably made, will be compelled to surrender it, or, if he has
disposed of it to a *bona fide* purchaser, to account not only for its
real value, but for any profit realized by him on such resale ; and
this will be done upon the demand of the principal, although it
may not appear that the property, at the time the agent fraudu-
lently acquired it, was worth more than he paid for it ;

(4) That the law will not, in such case, impose upon the principal the
burden of proving that he was, in fact, injured, and will only
inquire whether the agent has been unfaithful in the discharge of
his duty ; for, while the agency continues he must act, in the
matter of such agency, solely with reference to the interests of
his principal ; and the law will not permit him, without the knowl-
edge or assent of his principal, to occupy a position in which he
will be tempted not to do the best he may for the principal.

THE case is stated in the opinion.

*Mr. Alexander H. Robertson* and *Mr. William A. Fisher*
for appellant.

*Mr. George E. Hamilton* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This appeal brings up for review a decree dismissing a bill brought by the appellant for the purpose, among others, of obtaining a decree setting aside and cancelling of record certain deeds and mortgages alleged to have been made in fraud of his rights.

The principal question in the case is whether the real estate, covered by those deeds and mortgages, was acquired by the appellee Polk in violation of his duty to the appellant.

Ella V. Davis, a citizen of Maryland, died in 1881, leaving a will, by which Augustine C. Dalrymple was appointed a trustee with power to sell and convey such estate of the testatrix as did not yield an income, and could not be leased to advantage.

Dalrymple renounced the trusteeship, and on the 3d of June, 1881, by an order of the proper court of Maryland, William A. Stewart was appointed in his place as trustee. Stewart, subsequently, on the 6th day of April, 1885, resigned that position, and the present appellant was substituted in his place.

The testatrix, at her death, was the owner of numerous lots in Plattsmouth, Cass County, Nebraska. In the fall of 1885 the appellant Robertson visited that city for the purpose of effecting a sale of them, if, upon investigation, it was deemed best to do so. He employed the appellees Samuel M. Chapman and Milton D. Polk, partners in the practice of the law as Chapman & Polk, to attend to the probating of the will in Cass County, and to obtain a judgment of the proper court construing the will and authorizing a sale of the lots. While in Plattsmouth, after conferring with real estate agents and others to whom he was introduced by Chapman, and who were familiar with the value of property in that city, he fully determined to sell these lots; the only question, he testified, " was to find a purchaser at $4000."

After returning to Baltimore, the place of his residence, Robertson received a letter from Chapman, dated October 22, 1885, in which the latter said : " We have been canvassing the sale of the realty belonging to the Davis estate and $4000 is the best offer we can get — $1000 down and the balance

when a deed is made and confirmed by court. I have prepared petition to sell and will take first order next week. If a sale of this property is consummated, it should be done before winter sets in, as you cannot then, in all probability, get a fair offer before matters open up next spring. Looking this property over, I am, as you well know, very firmly convinced that you should sell it now, as a long, hard winter will, in the condition it now is, unquestionably reduce it in value."

Under date of November 14, 1885, Polk, in the name of his firm, wrote to Robertson: "A man here by the name of O'Donohoe says he will give $4000 for that property — $1000 cash, balance in three equal annual payments, at.7 per cent, secured by mortgage on that, together with mortgage on other property, so that the security will be ample. Not long ago he offered $4000 cash, but times are dull here now, and he says the time-payment offer is the best he will do. If the above is satisfactory to you, you can advise us, and we will arrange the matter to close up the trade with him as soon as possible, as money matters are getting close here, with no flattering prospect of better times soon. We are yours to command. The above is the best we have been able to do thus far, but if not satisfactory let us hear from you at your convenience."

To this letter Robertson replied, under date of November 17, 1885, as follows: "Yours of the 14th is before me. I am decidedly of opinion that the property in your city should be sold, and that, too, at once. I think the offer a fair one, and you are authorized to accept the same. Please send me the mortgage and notes as soon as consummated."

On account of the absence from Plattsmouth of both Chapman and Polk, some delay occurred in the preparation of the deed, mortgage, and notes. But, on the 12th of December, 1885, the papers were mailed to Robertson — Polk, in the name of his firm, writing : " Enclosed please find blank deed, mortgage, and notes of O'Donohoe. He did not like giving his notes before he got his deed, but finally he signed everything up in proper shape. Now, there are some taxes due and payable against the property, and I agreed with him that when

he paid the $1000 (on the receipt of his deed) we would accept tax receipts for those taxes in lieu of the amount of taxes in currency.  Court is in session, and we expected to have had a decree before this, but have not ; no doubt will have by time deed reaches us.  Money matters are very close here.  .  .  . You can send us deed and we will collect and remit to you, or if you do not know us well enough to be satisfied and do not care to inquire of any bank in this city, you can send deed to First National Bank with full instructions."  To this letter was this postscript : " O'Donohoe claimed he might want to pay off those notes next fall, and would not sign unless they were made so he could pay them if he chose to do so.  I did not think it would make any difference with you."

Under date of December 17, 1885, Robertson returned the deed, notes, and mortgage to Chapman & Polk, with directions to record the mortgage, returning the original to him, and to deliver the deed when a decree for the sale of the property was passed.  In this letter Robertson said : " Please see that a decree is passed by your court authorizing sale before you deliver deed ; under our arrangement fee of $400 was to be charged and divided between us."  Polk, in the name of his firm, replied, December 22, 1885 : " Yours of recent date at hand, with deed duly executed and mortgage which I forgot to seal in my hurry to get it off in the mail.  I have sealed the same and will place on record as soon as we get decree and O'Donohoe pays in the money."

On the 22d of January, 1886, Polk enclosed to Robertson a draft for $449.15, as the balance in cash due on the first payment for the property bought by O'Donohoe.  In that letter, Polk said : " I reserved our fee of $200 out of the $1000 together with the taxes.  .  .  .  I will send complete statement in a day or two with duplicate tax receipts, together with what money is in bank here belonging to you."  Under date of January 26, 1886, he enclosed a statement to Robertson, indicating that he had received the cash payment of $1000, and accounting for it as follows : " Paid fee, $200 ; paid taxes, $319.50 ; remitted, $449.15."  This left a balance of $31.35.  In a postscript to this last letter, Polk said : " Now shall I

remit you the balance due or shall I apply it on taxes? The balance on taxes will have to stand until note is due and be deducted from that, I suppose. I think from the way things have been running that a sale at $3000 would have been profitable for the estate."

On the 28th day of January, 1886, the mortgage given by O'Donohoe and wife to the appellant, as trustee, to secure the notes executed by O'Donohoe, was filed in the proper office for record.

On the 3d of April, 1886, Polk wrote to Robertson: "If you would like the money on the note which falls due first, send it to Citizens' Bank at Plattsmouth for payment at an early date."

Under date of May 1, 1886, Polk wrote to Robertson: "Your favor of recent date at hand. The note you speak of was duly received by the bank, and is in their hands for payment. I traded O'Donohoe out of the property and had a note of $800, which was due several days ago, that I expected to put right on that note, as I have assumed the payment of them; but the party did not pay promptly, as I expected. He says, however, he will get me the money as soon as he can, which will not be long. If nothing happens I want to pay the other two notes in August." This letter is without date, but Polk fixes May 1, 1886, as the date, while Robertson fixes the month of February, 1886, as the time when he was first informed by Polk that he bought the property from O'Donohoe. It should be stated in this connection that Chapman had, upon examination, reached the conclusion that a decree to sell the property was unnecessary, and that the trustee had authority under the will to make a sale.

The record contains many letters that passed between Polk and Robertson in 1886, 1887, and 1888, which upon their face show that the latter, after receiving the letter of May 1, 1886, treated the former as the owner of the property by purchase from O'Donohoe.

Prior to the institution of the present suit, Polk had fully paid the first of the notes given by O'Donohoe and a portion of the second note. And Polk and wife sold and conveyed some of the lots and mortgaged others.

On the 21st of August, 1888, O'Donohoe wrote the following letter to Robertson :

"M. O'Donohoe, attorney and solicitor.
"PLATTSMOUTH, NEB., *August* 21, 1888.

"A. H. Robertson, Baltimore.

"SIR : I am not the real and '*bona fide*' purchaser of the property in this city of which you are the trustee. Milton D. Polk, Mr. Chapman's partner, is the purchaser. He was the agent, and as such could not become the purchaser. He agreed with me to purchase it and that he would pay me. He has failed to pay me, and if you employ me I can set aside the sale and the property falls again into your hands. I deeded the property to Polk on the same day on which I bought from you, and next day Polk sold $\frac{1}{2}$, half, lot on Main St. to V. V. Leonard for $1600. It was worth $2000. In fact, the 2 half lots on Main St. were worth the $4000 in ready cash. The whole property is worth now $20,000 and even more. You have received $2000, and you can have five times the amount if — agree with me. The deed can be readily set aside.

"Polk managed and controlled the whole deception by which the sale was effected. If you give me power of attorney to act I will set the deed aside without any expense to you.

"Yours sincerely,                    M. O'DONOHOE."

The present suit was brought January 26, 1889, to obtain a decree setting aside the above-mentioned conveyances and mortgages as having been made in fraud of the rights of Robertson. So far as Polk and Chapman are concerned, the bill charges that they fraudulently represented to the plaintiff that the property was in fact worth only $4000, when they knew or ought to have known that it was worth much more than that sum ; and that the original purchase in the name of O'Donohoe was a mere device upon the part of Polk, in violation of his duty as the plaintiff's attorney and agent, to get the property at less than its value, concealing from the plain-

tiff, all the while before the conveyance to O'Donohoe, the fact that he, Polk, bought in the name of O'Donohoe. In respect to the grantees and mortgagees, holding under Polk, the charge is, that they knew or should have known that the conveyances and mortgages in question were in fraud of plaintiff's rights. The relief asked was that all the conveyances and mortgages be cancelled, and if that could not be done, that plaintiff have personal judgment against O'Donohoe, Polk, and Chapman, for the full value of the property. The plaintiff offered to pay into court the money he had received through the alleged sale to O'Donohoe for the use of such persons as were entitled to it, in case the conveyances and mortgages referred to were cancelled of record.

Notwithstanding the positive statement in his letter of August 21, 1888, to the effect that Polk was the real purchaser of the property, and had practised a deception upon the plaintiff, O'Donohoe, in an answer verified by his oath, alleged the fact to be " that said Chapman & Polk, at the request of this answering defendant, notified complainant that he (this answering defendant) wished to purchase said real estate at said price; that after some correspondence this answering defendant did purchase said property in good faith, intending to keep the same for his own use; that soon afterwards this answering defendant became satisfied it would be impossible for him to pay the balance due on said property, namely, $3000, without great inconvenience to him; that thereupon this answering defendant, for a good and valuable consideration, sold and conveyed said property to Milton D. Polk, one of the codefendants herein; that each of said sales were *bona fide* and without any collusion between this defendant and his codefendants; that each of said transactions was complete and entire in itself, and also that at the time of said transaction the full value thereof was paid in each instance, and there was no intention on the part of this defendant to defraud in any manner the estate of said deceased; . . . that there was no understanding by this answering defendant that said sale should in fact be a sale to said Polk, and that said deed from complainant to this answering defendant was not re-

corded sooner than it was for the reason that this answering defendant experienced difficulty in raising the first $1000 in cash which he was compelled to pay before said Chapman & Polk would deliver said deed to him."

The answers of Chapman and Polk met all the material allegations of the bill with full and explicit denials.

The record before us discloses nothing upon which to found a charge of fraud or want of good faith upon the part of the defendant Chapman. His partner and himself were employed to attend to the probating of the will of plaintiff's testatrix, and to obtain a decree construing it and authorizing a sale of the property in Plattsmouth belonging to the Davis estate. The fee which, by agreement with the plaintiff, was authorized to be charged had reference entirely to legal services to be rendered by his firm. He did not assume any responsibility in connection with the property in question, except such as would arise from services of that kind. He did not undertake, for compensation, to negotiate a sale of it for the plaintiff.

When the plaintiff visited Plattsmouth in the fall of 1885 for the purpose of ascertaining the condition of the Davis estate in that city, and of determining what was his duty as trustee in respect to it, he invited an expression of opinion by Chapman as to what the property was worth. The latter informed him that his judgment upon such a subject was of little value, but that he would put him in communication with persons whose opinions were entitled to consideration. This was done, and, upon full information as to the then value of real estate in Plattsmouth, the plaintiff determined before leaving that city to sell, if he could get an offer of $4000. And, after his return to Baltimore, he received a letter from Chapman, stating that he and Polk had canvassed the subject, and that $4000 was the best price that could be obtained. Chapman advised the acceptance of the offer, as is shown by his letter of October 22, 1885. But this advice, and Chapman's expression of willingness to assist in finding a purchaser, were not in execution of his duties as an attorney, although, perhaps, superinduced by the relations es-

tablished between his firm and the plaintiff in respect to legal services to be rendered.

The only evidence tending to show that the firm of Chapman & Polk undertook to act as agents for the sale of this property is furnished by certain letters written by Polk in the name of his firm to the plaintiff. But those letters were written without the knowledge or direction of Chapman, and Polk was without authority, in virtue of his partnership with Chapman in the practice of the law, to accept for his firm an agency for the mere sale of real estate. Whatever he did, in respect to the sale made to O'Donohoe, was upon his own responsibility, and imposed no liability upon the defendant Chapman.

What is the case as to the defendant Polk? It is not to be doubted that the relations between himself and the plaintiff in respect to the sale of this property, were those of agent and principal. He was precluded by the position voluntarily assumed by him from taking advantage of his principal, or from dealing with the property committed to his care in any other capacity than as an agent, who was bound to subordinate his own interests to those of his principal. He could not, directly or indirectly, become the purchaser and maintain any title thus acquired as against his principal; for, in so purchasing, his duty and his interest would come in conflict. If an agent to sell effects a sale to himself, under the cover of the name of another person, he becomes, in respect to the property, a trustee for the principal, and, at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a *bona fide* purchaser, to account not only for its real value, but for any profit realized by him on such resale. And this will be done upon the demand of the principal, although it may not appear that the property, at the time the agent fraudulently acquired it, was worth more than he paid for it. The law will not, in such case, impose upon the principal the burden of proving that he was, in fact, injured, and will only inquire whether the agent has been unfaithful in the discharge of his duty. While his agency continues, he must act, in the matter of such agency,

solely with reference to the interests of his principal. The law will not permit him, without the knowledge or assent of his principal, to occupy a position in which he will be tempted not to do the best he may for the principal.

It is earnestly contended that the evidence brings the present case within the operation of these principles. In this view of the facts we do not concur. The charge against Polk of dereliction of duty is not sustained. While there is some evidence tending to show that he desired, from the outset, to acquire an interest in this property, it does not appear that he intended to practise any deception upon the plaintiff. At any rate, he was not, in fact, interested in the offer made by O'Donohoe. The latter purchased on his own account exclusively, and without any understanding that Polk was to become interested with him, or should take his place in the purchase. Polk had no expectation, when O'Donohoe's offer was accepted, of becoming the owner of the property.

The only circumstance in the case indicating a want of frankness, on the part of Polk in his letters to the plaintiff, was a statement in the letter of January 22, 1886, implying that he had actually collected the cash payment of $1000. His explanation of this statement is that he had not been as diligent as he should have been in concluding the business, and he did not suppose it was of any consequence to the plaintiff whether the $1000 came from him or from O'Donohoe. It would have been more consistent with the truth if he had then stated that he had agreed, or would agree, with O'Donohoe to take the property, and, therefore, as between himself and O'Donohoe, he was bound to make good the latter's obligations to the plaintiff. But the failure of Polk to notify the plaintiff of his agreement with O'Donohoe immediately upon its being made, cannot affect any right acquired by him under that agreement. The sale to O'Donohoe was so far consummated that neither party was at liberty to undo what had been done. O'Donohoe executed his notes for the deferred payments, and, his wife uniting with him, gave a mortgage to secure them. The notes and mortgage were delivered to and accepted by the plaintiff, who executed a deed to O'Donohoe,

and placed it in the hands of Polk, to be delivered to O'Dono-hoe, whenever a decree for the sale of the property was obtained, and upon the payment of the $1000 stipulated to be paid in cash. So that at the time Polk took the property from O'Donohoe, it was not in the power either of the plaintiff or of O'Donohoe to rescind the contract between themselves, and Polk's agency for the sale of the property had, in every material sense, terminated. Nothing then stood in the way either of O'Donohoe agreeing that Polk should take the prop-erty, or of Polk becoming a purchaser from him. If the sale to O'Donohoe was an actual sale, in good faith, so far as Polk had any agency in effecting it — if the contract between the plaintiff and O'Donohoe had been so far executed at the time Polk took O'Donohoe's place in the purchase, that it could not be rescinded by either party to it — then Polk's agency in selling the property did not prevent him from purchasing from O'Donohoe. And his failure to give notice of his purchase immediately upon its being made cannot be regarded as a fraud upon the rights of the plaintiff. A real *bona fide* sale of the property, through the agency of Polk, and upon the terms prescribed by the plaintiff, and which sale was substan-tially completed between vendor and vendee, intervened be-tween Polk's acceptance of the position of agent and his purchase of the property from the plaintiff's vendee. Upon this ground, the decree below can be sustained, without impair-ing, in any degree, the rule that an agent will not be permitted to become the purchaser, without the knowledge or consent of his principal, of property committed to him for sale. That the defendant Polk did not intend to conceal the fact of his pur-chase, is made clear by his letter of May 1, 1886, in which he informed the plaintiff that he had " traded O'Donohoe out of the property." The plaintiff's recollection was that this infor-mation was received by him from Polk some time in February, 1886. He never complained, at the time, or afterwards, that Polk took O'Donohoe's place in the purchase. But his present complaint, based upon O'Donohoe's letter of August 21, 1888, is that Polk, his agent to sell, while pretending to have sold to O'Donohoe, had, without his knowledge or assent, taken the

property for himself, in the name of O'Donohoe, and that he did not become aware of that fact until August, 1888. If this complaint were well founded, the plaintiff, according to the principles to which we have referred, and which are deeply rooted in the law, would be entitled to a decree that would deprive Polk of the fruits of his infidelity. But, as already suggested, the evidence does not justify the conclusion that O'Donohoe's purchase was, in fact, for the benefit of Polk.

It is proper to say that in our decision of this case, no controlling weight has been attached to the statements made by O'Donohoe.                                                    *Decree affirmed.*

MR. JUSTICE JACKSON and MR. JUSTICE WHITE did not hear the argument, and took no part in the decision of the case.