## In re MARQUETTE MANOR BLDG. CORPORATION.

### NATIONAL BUILDERS BANK OF CHICAGO v. BROWN et al.

### No. 6570.

Circuit Court of Appeals, Seventh Circuit.

June 2, 1938.

Rehearing Denied July 15, 1938.

Arthur J. Hughes, Frank Michels, and C. S. Macaulay, all of Chicago, Ill., for appellant.

Charles W. Mead, Gustav Andreen, Jr., and Harry S. Harned, all of Chicago, Ill. (Edward G. Berglund, of Chicago, Ill., of counsel), for appellees Brown and others.

Michael Gesas and Edward G. Berglund, both of Chicago, Ill., for appellees Becker and Smith.

Before SPARKS, and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from an order entered December 6, 1937, by the court below reducing the claim of the Bondholders' Committee filed in the corporate reorganization proceedings of the debtor, from $135,900 to $74,300. The court decreed that bonds aggregating $61,600, included in the Committee's claim, be subordinated in lien, which accounts for the reduction in the allowed claim. The master to whom the matter was referred made a report recommending such reduction. Exceptions were filed to such report, which were overruled by the court and the report approved. The appeal is taken from this order.

On October 4, 1932, Terrill Bond and Mortgage Company (hereinafter referred to as Terrill), executed its collateral note in the amount of $25,000 to appellant and pledged various securities, including bonds of the debtor here in controversy. This note was renewed from time to time, with some changes in the amount and character of the collateral until March 1, 1934, when the last note, maturing March 30, 1934, was given. By the terms of the pledge, appellant was authorized to sell said collateral, without notice at public or private sale in case of non-payment of the loan at maturity. Appellant claims it had an agreement with Terrill that upon the sale of the collateral, appellant might become the purchaser thereof. The debtor, of course, was not a party to such agreement and neither was the bondholders' committee. In March of 1933, appellant was advised that the bonds pledged with it were in default and a foreclosure suit had been instituted in the State Court.

On March 31, 1933, a bondholders' committee was organized consisting of S. N. Becker, Chairman, Roy J. Smith and Myron D. Goldberg. Edward G. Berglund was designated as Counsel to the committee, and appellant as depositary. Goldberg was appellant's cashier and appears to have had the controlling voice in the affairs of the committee. As a member of the committee, he was in a position to and did become familiar with the value of, the proceeds from, and the expenses incurred in connection with the various properties, securing the collateral which appellant held for the Terrill note, and especially the property of the debtor securing the bonds in question.

At the time of the organization of the committee, appellant held, as collateral security for the Terrill note, bonds of debtor in the sum of $61,600, together with various other bonds and securities. On May 6, 1933, appellant deposited with the committee the said bonds of the debtor held by it as collateral and on June 19, 1933, a certificate of deposit was issued to Terrill, assigned to and retained by appellant.

On June 11, 1935, after numerous conferences among the officials of appellant, including Goldberg, appellant gave public notice that it would sell all of the collateral held by it as security for the note on June 14, 1935, at 10:00 in the forenoon at the Clark Street entrance of the County Building in the City of Chicago. The public notice consisted only of the posting of three notices in the City of Chicago. The attorney for the bondholders' committee was given two days' notice by telephone, but neither of the other two members of the committee, nor the bondholders, were given any notice. Goldberg, as cashier of appellant, was authorized on its behalf to bid at such sale $5,000 for such collateral security, and, if necessary, in order to purchase the same, to bid as high as $25,000. No other bidders appeared at the sale and Goldberg, on behalf of appellant, purchased the collateral for the initial bid of $5,000. The collateral thus purchased by appellant consisted of bonds of the par value of $61,600 of the debtor (those in controversy); bonds of the par value of $29,600 of Paulina Mansions; bonds of the par value of $49,800 of Marquette-Chateau Building; notes signed by various churches in the aggregate amount of approximately $125,000, and a judgment against the American Hospital in the sum of $20,020.57.

The master found that appellant received payment in full of its note from the collateral purchased at such sale, not including the subordinated bonds in question, and we think this finding is supported by substantial evidence. While we find no direct finding as to the exact amount due upon appellant's note at the time of the sale, yet the master does find that on March 30, 1934, which was the date of its maturity, there was an unpaid balance on said note of $22,662 and the amount due on June 4, 1935 is readily ascertainable by adding interest for such period to the amount found to be due and unpaid. While an officer of appellant testified that the collateral was not worth more than the amount of the bid, yet the records of appellant disclose that within fifteen days after

the sale the collateral was set up on the books of appellant at a "total true value or actual worth of $92,551.62." It was also shown that shortly thereafter an agreement was entered into between appellant and the trustees of the American Hospital with reference to the judgment against said hospital in the sum of $20,068.02; that appellant received $5,000 in cash in said settlement and a first mortgage upon real estate owned by the hospital in the sum of $18,777 payable at the rate of $500 per month, and in addition thereto, appellant was paid another $4,000 in cash, which it claims was for attorney fees and expenses in connection with said transaction, but the record seems to be silent as to whom or in what amounts said sum was expended by appellant. In addition to this, appellant expects to receive the sum of $6,304 on account of the bonds of Paulina Mansions which were involved in another reorganization proceeding. There was also testimony as to a notation appearing on the back of the Terrill note, made by an officer of appellant, which indicated that the note had been fully paid.

The essential controversy is whether appellant was entitled to make a profit on the sale of the collateral security or whether it was only entitled to receive payment of the Terrill note. Appellant contends it was entitled to make a profit on the transaction; in other words, to realize all it could from the securities purchased at the collateral sale, while appellees say that appellant occupied a fiduciary relation and was entitled to nothing more than the payment of its note. The lower court adopted appellees' theory and we think correctly so. We have examined the authorities upon which appellant relies and they are not in point. True, it is generally held that the holder of collateral security under authority to sell may purchase the same at such sale without any restriction upon his right to make a profit. In other words, the purchaser at such sale is permitted to step in the shoes of the assignor of the collateral. That, no doubt, would have been the situation here had appellant exercised its right of sale under the circumstances originally created by the assignment of the collateral to it, but those circumstances were materially altered by subsequent events.

After the organization of the bondholders' committee, of which appellant's cashier was a conspicuous member, and the designation of appellant as the depositary for said committee, the rights, and especially the duties devolving upon appellant were of an entirely different character.

The depositary agreement of which appellant, as depositary, the committee and bondholders were parties, expressly provided that the title to all deposited securities vested in the committee immediately upon their deposit with the depositary; the committee was authorized to execute any and all transfers and assignments of bonds deposited with it and to have and exercise all the rights and powers of absolute owners with reference to said bonds, and in fact to have complete control of all compromises, releases or settlements made with reference to said bonds. The committee was also authorized in its discretion to give bondholders notice of any proposed action and, in case it so decided, its action was to be binding upon such bondholders unless they filed their written dissent thereto, in which case they were to have permission to withdraw their bonds. The purpose of the formation of the bondholders' committee must have been for the protection of those who deposited their bonds and to obtain by reorganization, compromise or settlement that which would be the most advantageous to them.

It is difficult to see how this purpose could be served with appellant occupying a dual, and perhaps a three-fold position. As a bank it was properly interested in the collection of the Terrill loan; through its cashier it was serving as a member of the committee and was also acting as its depositary. It was in the interest of appellant, as a bank, to purchase the collateral offered at the sale at a low price. It was the duty of the committee and the bank, as its depositary, to sell the bonds at the best price possible, for it is apparent the more realized from such sale, the less would be the indebtedness against the property securing the bonds and the greater would be the security for other bondholders. The least appellant could have done was to notify all members of the committee of the sale, and under the circumstances we think it was obliged to see that all bondholders had notice. Ordinarily, no doubt, the duty of notifying the bondholders would rest upon the committee, but where, as here, we find appellant's chief agent an important member of the committee, it seems appellant was not without responsibility in this respect.

Our attention is called to no authority where a court has considered a propo-

sition such as is here presented. There is much authority, however, to the effect that those who serve in a fiduciary capacity are not permitted to do so for their own gain. Typical of such cases is that of Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418, where the court on page 588, 41 S.Ct. on page 201, said:

"Ambrose, had, as receiver, the affirmative duty to endeavor to realize the largest possible amount from the Schwab note. Baker v. Schofield, 243 U.S. 114, 37 S.Ct. 333, 61 L.Ed. 626; Robertson v. Chapman, 152 U.S. 673, 681, 14 S.Ct. 741, 38 L.Ed. 592. To this end it was his duty to endeavor to have the land, when sold under the trust deed, bring the largest possible price. J. H. Lane & Co. v. Maple Cotton Mill, 146 C.C.A. 415, 232 F. 421. When he agreed with Smith and Wilson to join in the purchase if Wilson should become the successful bidder, he placed himself in a position in which his personal interests were or might be, antagonistic to those of his trust. Michoud v. Girod, 4 How. 503, 552, 11 L.Ed. 1076. It became to his personal interest that the purchase should be made by Wilson for the lowest possible price. The course taken was one which a fiduciary could not legally pursue. Magruder v. Drury, 235 U.S. 106, 119, 120, 35 S.Ct. 77, 59 L.Ed. 151. Since he did pursue it and profits resulted the law made him accountable to the trust estate for all the profits obtained by him and those who were associated with him in the matter, although the estate may not have been injured thereby."

■ Concluding as we do that appellant, under the circumstances, was acting in a fiduciary capacity, and was obligated in connection with the committee of which it was a part, to refrain from disposing of the bonds in question except in a manner most advantageous to other bondholders who had deposited their bonds, and having failed to discharge its duty in this respect, it necessarily follows that appellant should not be permitted to make a profit, huge or small, from the transaction. We are of the opinion that appellant was entitled to have the obligation owing it, represented by the Terrill note, discharged in full. As heretofore stated, the master and the court below found it was so discharged. We have examined the record rather carefully with reference to this controverted question of fact and are satisfied that the evidence in support of such conclusion was not only substantial, but convincing. This obligation having been thus discharged, appellant was entitled to nothing more. To hold otherwise would give it an advantage which would be neither fair nor equitable under the presented circumstances.

The decree of the District Court is affirmed.