NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

24-P-1349                                        Appeals Court

TRACEY E. FERN[1]  vs.  ANTHONY W. BAKER[2] & others.[3]

No. 24-P-1349.

Barnstable.     November 17, 2025. – March 27, 2026.

Present:  Henry, Sacks, & Tan, JJ.

Will, Power of appointment.  Power of Appointment.  Uniform Durable Power of Attorney Act.  Gift.  Fiduciary.  Intent. Practice, Civil, Attorney's fees.

Complaint filed in the Barnstable Division of the Probate and Family Court Department on April 9, 2019.

The case was heard by Edward F. Donnelly, Jr., J.

John P. Fulginiti (Timothy D. Braughler also present) for the plaintiff.
Tiffany M. Bentley (Richard M. Novitch also present) for the defendants.

───────────────

[1] Individually and as cotrustee of the Daniel J. Fern Trust.

[2] Individually, as copersonal representative of the estate of Frances R. Fern, and as cotrustee of the Daniel J. Fern Trust.

[3] Christopher A. Baker, individually and as copersonal representative of the estate of Frances R. Fern; and Lisa A. LoPorto, individually.

SACKS, J.  Using the authority assertedly granted in a durable power of attorney from their elderly mother, Frances R. Fern (Frances), the defendants Anthony W. Baker (Tony) and Christopher A. Baker (Chris) made gifts from their mother's assets to themselves in amounts totaling $5.576 million, and an additional $43,000 to Tony's long-term partner, defendant Lisa A. LoPorto (Lisa).[4]  After Frances died in 2018, leaving a gross estate of more than $37 million, the plaintiff, Tracey E. Fern (Tracey) -- who is Frances's daughter by a second marriage and thus Tony's and Chris's half sister -- learned of the gifts and brought this suit in the Probate and Family Court.  Tracey's complaint asserted, as relevant here, that the gifts were not authorized by the power of attorney, were not in any event intended by Frances, and were improperly motivated and thus a breach of Tony's and Chris's fiduciary duties to Frances. Tracey did not object to Frances's will, which left the bulk of her estate in equal shares to Tony, Chris, and Tracey.

After an eight-day trial in 2022, a judge of the Probate and Family Court found against Tracey on all claims and entered judgment for Tony, Chris, and Lisa.  Tracey appealed, and Tony,

---

[4] Because two of the defendants share a last name, and because the plaintiff shares a last name with her late mother, we use their first names for ease of reference, adopting the short forms of the names used in the parties' briefs.

Chris, and Lisa cross-appealed from so much of the judgment as denied their request for attorney's fees and costs. We affirm the judgment in all respects.

Background. We summarize the most relevant facts as found by the judge, reserving certain points for later discussion. Frances was born in 1922 and had three children with her first husband, Arthur Baker: Francis R. Baker (Frank) (born in 1954), Chris (born in 1956), and Tony (born in 1958). After her first husband died, Frances married Daniel J. Fern (Daniel) in 1960; Daniel was an attorney and real estate investor and a founder of the Hy-Line Ferry. Frances and Daniel had one child together, Tracey (born in 1963). The family lived on Cape Cod.

The younger three children's relationships with Frances were, at varying times and to varying degrees, difficult.[5] Tony had some conflicts with Frances during his school and college years, but by 2001 he had become a critical support to Frances -- handling her finances, taking her to appointments, acting as her handyman, and listening to her "vent." Chris had periods of estrangement from Frances in 1974-1975 and for some months in the early 1980s, but by 2001 they spoke weekly, although Chris moved to California and lived there until 2017.

_____

[5] We focus on the younger three children because Frances did not include Frank in her estate plan.

Tracey's relationship with Frances was more troubled. During Tracey's childhood, Frances was prone to becoming irrationally angry and verbally and physically abusive. After an incident in 1987 in which Frances attacked her, Tracey had no contact with Frances for six to eight months. After they resumed contact, Tracey described the relationship as "guarded," and Tony described it as "very complicated and often toxic." Tracey had two daughters, but Frances felt that she had "very limited access to [them], her only grandchildren." Frances was disappointed that "Tracey's visits were infrequent and brief." When Frances's husband and Tracey's father Daniel died in 2001, Frances was upset that Tracey did not sit with or hug her at the funeral.

1. First will and power of attorney. In 2002, Frances executed a will and a durable power of attorney. The will devised her jewelry and $50,000 each to Tracey's daughters; $100,000 to Tracey; $10,000 to each of two charities; and the remainder of her estate in equal shares to Tony and Chris, whom the will nominated as executors. Frances gave a power of attorney to Tony and Chris, authorizing them, among other things, to make gifts from her assets.

In March 2012, Frances fell and was hospitalized. She became combative, agitated, angry, and "just not herself." She accused Chris of kidnapping her and accused Tony of stealing her

wallet and papers. She wanted Tracey to take care of her and began communicating more frequently with Tracey. Tracey told Frances not to trust Tony and Chris and that they were trying to take control of Frances's finances. At the suggestion of Tracey's husband, Frances retained a new attorney, and then she revoked her previous will, health care proxy, and power of attorney.

2. Second will and power of attorney. In April 2012, Frances executed a new will, which devised $150,000 each to Tony and Chris; $10,000 to each of two charities; and the remainder of her estate to Tracey, who was to serve as her personal representative. Frances also gave a durable power of attorney (which included gifting authority) to Tracey, with Tracey's husband to serve as the alternate. Frances moved from a rehabilitation facility back to her home. Frances then visited her various banks, "telling anyone who would listen that [Tony and Chris] had tried to have her declared incompetent and take over her affairs."

In the fall of 2012, however, Tracey began visiting less often, and Frances seemed to be "slowly coming back" and "starting to question what happened." At a birthday lunch for her in October 2012, Frances told Tony and Chris that she was happy to see them and "wanted things to go back to the way they had been." In February 2013, Frances wanted to revoke the power

of attorney to Tracey "but had not decided who to name as the new attorney-in-fact."

3. <u>Third will and power of attorney</u>. In March 2013, Frances executed a new will, which after her death in 2018 was admitted to probate without objection. The will devised her jewelry to Tracey's daughters; $10,000 to each of two charities; and the remainder of her estate in equal shares to Tony, Chris, and Tracey. The will nominated Tony and Chris to serve as copersonal representatives. Frances also executed a new durable power of attorney to Tony and Chris. The power authorized them, among other things, "[t]o make outright gifts of my property to or for the benefit of such persons who, in the opinion of my said attorney, would be the donees I may choose."

Frances told Tony that the new will treated him, Chris, and Tracey equally, and that Tracey had promised that she and her daughters would be part of Frances's life. Frances told her attorney at the time that she "wanted to give Tracey a second chance." In mid-2013, however, after an emotional discussion of finances, Frances's relationship with Tracey took another turn for the worse. Tracey and her daughters did not visit as much as Frances wanted. Frances told Tony that "she hoped she had not made a mistake in changing her will."

At about this time, Frances and Tony discussed gifting. Frances "realized there would be large tax savings." She told

Tony that "she would review any gifting in the future and that her only concern was who was with her in her old age."

Toward the end of 2013, Frances's health declined rapidly, resulting in multiple hospitalizations and then her move to an Alzheimer's unit at a health care center, where she remained until her death in 2018. During her final years, Frances was still able to recognize visitors, including Tony, Chris, and Lisa, and was happy to see them. Tony visited five times per week and celebrated birthdays and holidays with Frances; sometimes he brought Frank along. Chris moved from California back to Massachusetts in early 2017 and visited Frances about twice per week. Lisa visited Frances three or four times per week and every other weekend.

Tracey visited once in January 2014, but she found Frances's behavior during that visit upsetting and never visited again, feeling that she was a "trigger" for Frances. Frances sometimes expressed disappointment and disbelief that Tracey and her daughters did not visit. Frances was also "hurt and puzzled" that Tracey, unlike Tony and Chris, did not maintain a relationship with their older brother, Frank.

4. Gifts. Tony and Chris first considered making large gifts in July 2016. We reserve for later discussion the judge's findings about their understanding of Frances's donative intent. For now, we note only that the judge found that "the decision to

start making gifts was spurred by the Presidential elections and anticipated changes to the tax laws." Tony and Chris understood that the Democratic candidate for President proposed to substantially reduce the Federal gift and estate tax exemptions and to increase the estate tax rate. Tony also "consulted with a tax professional and determined that gifting would result in substantial savings on the expected Massachusetts estate tax."

Beginning in July 2016, Tony and Chris caused gifts to be made to themselves in installments, as Frances's many certificates of deposit matured. Tony's gifts totaled $2.938 million and Chris's $2.638 million; in each case, all but $49,000 of gift funds was received before the 2016 election.[6] Lisa received a total of $43,000. Tony and Chris did not discuss these gifts with Frances, believing that they were consistent with her intentions but that she no longer had the capacity to understand financial matters.

5. <u>Truro property</u>. In July 2016, Tony and Chris learned of a house and property for sale in Truro. They purchased it that October for $3.3 million, with each of them contributing

---

[6] These amounts, as stipulated by the parties and incorporated in the judge's findings, were the subject of a postjudgment motion by Tracey to correct clerical mistakes. That motion was not acted on by the time the record was assembled for this appeal, but any changes in the totals caused by a ruling on that motion would not affect our analysis or conclusions.

one-half of the purchase price. Tony and Chris had sufficient assets to purchase without using the gifts from Frances, and at trial they both denied that the gifts affected their decision to purchase the property. They lived there at the time of trial. The judge ultimately concluded that "[t]he optics of this purchase, close in time to the gifts, certainly were not ideal. However, where [Tony and Chris] proved that the gifts were authorized by the power of attorney and not a breach of their fiduciary duties, they could use the gifts as they wished."

Discussion. We begin by addressing Tracey's argument that the gifting clause in the third power of attorney did not authorize Tony and Chris to make gifts to themselves.[7] We then turn to Tracey's claim that, even if Tony and Chris were given such authority, they failed to carry their burden of proving that their exercise of it here was consistent with their fiduciary duties and Frances's donative intent. Finally, we consider whether the judge abused his discretion in denying the request of Tony, Chris, and Lisa for attorney's fees and costs under G. L. c. 215, § 45.

1. Authority granted by power of attorney. Chief among the "rules of construction related to powers of attorney" is that "[t]o ascertain and effectuate the intent of the parties as

---

[7] Tracey does not challenge the gifts to Lisa.

manifested by the words used and the object to be accomplished is the goal of all interpretations of written agreements" (citation omitted).  Barbetti v. Stempniewicz, 490 Mass. 98, 111-112 (2022).  A power of attorney is "subject to a rule of strict construction," but "[t]his rule does not go to the extent of destroying the purpose of the power" (quotation and citation omitted).  Id. at 112.  We determine the effect of the language of a power of attorney de novo.  See id.

Tracey contends that the gifting authority Frances granted in the third power of attorney -- to make "outright gifts of my property to or for the benefit of such persons who, in the opinion of my said attorney, would be the donees I may choose" -- was insufficient to authorize gifts to Tony and Chris, i.e., the attorneys themselves.  Tracey relies on our statement in Gagnon v. Coombs, 39 Mass. App. Ct. 144, 157 (1995), that "self-dealing by an agent, in the absence . . . of distinct authority from the principal expressly granted in the empowering instrument, has been continuously and uniformly denounced as one of the most profound breaches of fiduciary duty."  Tracey argues that the gifting language in Frances's power of attorney was not sufficiently distinct and express to authorize the gifts challenged here.

Tracey reads Gagnon too broadly.  Nothing in that decision establishes particular requirements for how explicit the

language of a power of attorney (or other instrument) must be before an agent, given express authority (such as to gift, or to sell, buy, borrow, or lend), may exercise that authority in a manner benefiting himself.[8]  Plainly it would suffice if Frances's power of attorney had authorized gifts to "persons who may include my attorney" or "persons who may include any or all of my children."  The language Frances actually used here -- "persons who, in the opinion of my said attorney, would be the donees I may choose" -- was sufficient to authorize gifts to the attorneys themselves, at least where they were her immediate family members.  Under § 201(b) of the Uniform Power of Attorney Act (UPAA), the power to gift includes by default the power to make a gift to the attorney, if the attorney is also an ancestor, spouse, or descendant of the principal.  Although the

---

[8] Nor are such requirements established in any of the authorities relied on in Gagnon, 39 Mass. App. Ct. at 157-158. See O'Brien v. Dwight, 363 Mass. 256, 283-284 (1973); Mackey v. Rootes Motors Inc., 348 Mass. 464, 467-468 (1965); Berenson v. Nirenstein, 326 Mass. 285, 288-289 (1950); Pitman v. Pitman, 314 Mass. 465, 471, 476 (1943); Dolbeare v. Bowser, 254 Mass. 57, 61 (1925); Lindsay v. Swift, 230 Mass. 407, 412 (1918); American Circular Loom Co. v. Wilson, 198 Mass. 182, 206-207 (1908); Sikes v. Inhabitants of Hatfield, 79 Mass. 347, 353 (1859); Jennison v. Hapgood, 24 Mass. 1, 7-8 (1828).  See also Robertson v. Chapman, 152 U.S. 673, 681-682 (1894); Jerlyn Yacht Sales, Inc. v. Wayne R. Roman Yacht Brokerage, 950 F.2d 60, 66-67 (1st Cir. 1991); Estate of Casey v. Commissioner of Internal Revenue, 948 F.2d 895, 898-899 (4th Cir. 1991); Fender v. Fender, 285 S.C. 260, 262 (1985); Creasy v. Henderson, 210 Va. 744, 749-750 (1970); Restatement (Second) of Agency §§ 34, 39, 387-389, 391, 394 (1958) (Restatement).

UPAA has not been adopted in Massachusetts, we may look to it for guidance on what authority a power of attorney ordinarily includes.  See Barbetti, 490 Mass. at 110.

After all, any exercise of the gifting authority in favor of the attorneys themselves must still satisfy the rule that "one acting in a fiduciary capacity for another has the burden of proving that a transaction with himself was advantageous for the person for whom he was acting" (citation omitted).  Cleary v. Cleary, 427 Mass. 286, 291 (1998).  Frances plainly believed that gifting could be to her advantage and in her interests, provided gifts were made in accordance with the standard she chose.  The burden was still on Tony and Chris to prove that the gifts met that standard.[9]

Tracey's attempts to bolster her position with additional phrases from Gagnon are unavailing.  First, she emphasizes a reference to "[t]he sedulous application and uncompromising rigidity of the prohibition against unauthorized fiduciary self-

---

[9] Tracey erroneously argues that the standard falls into the category of what the drafters of the Restatement termed "[a]ll-embracing expressions" that should be "disregarded as meaningless verbiage."  Restatement (Second) of Agency, § 34 comment h.  But the drafters were referring only to "phrases like 'as sufficiently in all respects as we ourselves could do personally in the premises,' [or] 'as the said agent shall deem most advantageous.'"  Id.  The standard Frances chose, in contrast, turned not just on her agent's opinion, but also on an external standard -- the donees she may choose -- and thus meaningfully constrained Tony's and Chris's discretion.

dealing." <u>Gagnon</u>, 39 Mass. App. Ct. at 158. But recognizing the importance of the prohibition against "unauthorized" fiduciary self-dealing does not by itself help us determine whether any particular instance of fiduciary self-dealing is unauthorized. Tracey also relies on the statement that "powers of attorney are to be strictly construed to require explicit, and not inferential, grants of 'dangerous' agency authority the exercise of which is potentially destructive of the principal's interests." <u>Id</u>. Again, however, <u>Gagnon</u> did not state that any particular form of words is required before an expressly granted power may be exercised in a manner benefiting the agent. And none of the strict-construction cases cited in <u>Gagnon</u>, <u>id</u>. at 157-158, suggests that even an expressly granted power must still be narrowly construed in order to limit self-dealing.[10]

Finally, the court in <u>Gagnon</u> tempered its interpretive discussion with a recognition of the same principles recently reiterated in <u>Barbetti</u>, 490 Mass. at 111-112. "The rule of strict construction does not go to the extent of destroying the purpose of the power, and the meaning of an unambiguous power of

---

[10] See <u>Estate of Casey</u>, 948 F.2d at 896, 900 (power "to lease, sell, grant, convey, assign, transfer, mortgage and set over" property did not encompass power to gift it); <u>Williams</u> v. <u>Dugan</u>, 217 Mass. 526, 528-530 (1914) (power to manage, sell, mortgage, and pay taxes on real estate did not encompass power to borrow to pay such taxes); <u>Hoyt</u> v. <u>Jaques</u>, 129 Mass. 286, 287-288 (1880) (power to sell did not encompass power to mortgage).

attorney is to be gleaned from the intent of the parties as manifested by the words used and the object to be accomplished" (quotations and citation omitted). Gagnon, 39 Mass. App. Ct. at 158 n.16. See Barbetti, supra (same). Here, Frances's clear intent, expressed in unambiguous language, was to authorize Tony and Chris to make gifts of her property to those persons who, in their opinions, would be "the donees [she] may choose." If Tony and Chris could prove that gifts to themselves met that standard, then for a court to construe the gifting power so strictly as to nevertheless bar such gifts -- particularly to two of the most natural objects of Frances's affection -- would risk "destroying the purpose of the power" (citation omitted). Gagnon, supra. We therefore conclude that the gifting authority in the power of attorney permitted gifts to Tony and Chris.

2. Frances's donative intent. Tracey argues that, even if the power of attorney authorized gifts to Tony and Chris, they failed to prove that Frances intended to make gifts to them totaling $5.576 million. She claims that the judge's decision is "devoid of any findings" that Frances had any such intent. We are not persuaded.

The critical issue under the power of attorney was not Frances's actual donative intent, but instead whether Tony and Chris had shown that, in their opinions developed in accordance with their fiduciary duties, Frances would have chosen to make

the gifts at issue.  Here the judge made extensive findings, based on testimony of Tony and Chris that the judge expressly credited, and then concluded that Tony and Chris "met their burden to prove that they acted in good faith and in [Frances's] interests in making the gifts."  "They demonstrated that in their reasonable opinion[s], [Frances] would have chosen to make the gifts and would have chosen not to make gifts to Tracey." We now summarize those findings, none of which Tracey specifically challenges as clearly erroneous.

The judge found that Tony and Chris discussed gifting with Frances and an accountant sometime in or around April 2013. Frances told Tony that she realized gifting would result in large tax savings and that the only question was when to make gifts.  She never specified a date but consistently said that it would be "when she got older, slowed down, and didn't need the money."  Tony "asked her who would make decisions about gifting if she were unable to do so.  She told him that he and [Chris] would be the judge and that she trusted them."

As for who would receive gifts, Frances told Tony "that her only concern was who was with her in her old age."  The judge credited Tony's and Chris's testimony that, in Frances's final years, the three people in her life were themselves and Lisa, while "Tracey was not part of [Frances's] life, and [Frances] would not have wanted to 'reward' her."

As for the timing of the gifts, Tony testified that as of July 2016, Frances had "sufficient assets to last the rest of her life without touching the principal."  Frances was then nearly ninety-four years old and had been living with "advanced dementia" for two and one-half years.  The judge credited Tony's and Chris's testimony that by then it was clear Frances's life had slowed down and she would never leave the health care facility where she lived.  He further credited their testimony that the decision to begin gifting was spurred by anticipated changes to the tax laws after the 2016 Presidential election.  Frances "did not like paying taxes and . . . doing so ruined her entire month each year."

As for the sizes of the gifts, the judge credited Tony's and Chris's testimony that the amounts were based on the tax exemptions in effect in 2016.  The judge concluded that "[t]he gifts took advantage of the annual gift tax exclusion amounts and the unified tax credit in place at that time.  There was credible evidence that the gifts reduced the Massachusetts estate tax paid by the estate."  Indeed, Tracey's appellate brief concedes that "the total amount gifted ultimately maximized Frances's estate tax exemption existing at the time."

Finally, the judge credited Tony's and Chris's testimony that they believed Frances, if she were competent, "would have chosen to make gifts at that time," but that she no longer had

the capacity to make such decisions.  Tony believed "the gifts were appropriate and consistent with [Frances's] expressed intention to make gifts when her life was winding down and to benefit the people involved in her life."  Chris understood that "his duty was to make gifts in the way [Frances] would have done herself" and believed that the gifts were consistent with that standard.  He believed it was to "everyone's benefit" to make the gifts before the tax laws changed.

The judge concluded from the testimony he credited that Tony and Chris had met their burden of proving that they acted in good faith and in Frances's interests; and that, in their reasonable opinions, she would have chosen to make the gifts to Tony, Chris, and Lisa, and would have chosen not to make gifts to Tracey.  The judge's findings were more than sufficient to support his conclusions, and we see no error in his decision.

Tracey nevertheless contends that the gifts were undertaken for the "improper purpose" of enabling Tony and Chris to purchase the Truro property.  She claims that the gifts "did not benefit Frances, nor comport with her intent in any way," and thus were a breach of Tony's and Chris's fiduciary duties. These assertions reflect nothing more than "dissatisfaction with the judge's weighing of the evidence and his credibility determinations."  Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).  They require no further discussion.

Tracey also argues that the judge, by "relying on Tony['s] and Chris's self-serving statements alone to justify the gifts," failed to apply the "heightened scrutiny" that Tracey claims is required by Estate of Moretti, 69 Mass. App. Ct. 642, 652 (2007). Even if the judge here had relied solely on Tony's and Chris's testimony,[11] the heightened scrutiny referred to in Estate of Moretti consisted merely of shifting the burden to a fiduciary to prove that a transaction from which he benefited did not violate his fiduciary duties. Id. at 651-653, citing Cleary, 427 Mass. at 293. The judge here applied that rule and found that Tony and Chris met their burden. Nothing in Estate of Moretti suggested that a fiduciary cannot meet that burden with the fiduciary's own testimony.

3. Attorney's fees and costs. Tony, Chris, and Lisa appeal from the judge's denial of their request for attorney's fees and costs under G. L. c. 215, § 45 (§ 45), which allows an award of fees and costs in contested probate cases "in the discretion of the court . . . as justice and equity may require." This language confers broad discretion on judges; it

---

[11] The judge also relied on the testimony of a long-time close friend of Frances's, Ana Weatherley, that Frances heavily relied on and trusted Tony, was estranged from Tracey and found their relationship to be a source of great pain, and said her "'biggest fear' was that Tracey would 'end up somehow having control' over [Frances's] assets." Further, the judge relied on Lisa's testimony about Frances's close relationships with Tony and Chris and her disappointment in Tracey.

"certainly reaches beyond bad faith or wrongful conduct."
Estate of King, 455 Mass. 796, 805 (2010).  But it "still pay[s]
homage to the usual American rule against an automatic award of
fees to the prevailing party, and require[s] a reason, grounded
in equity, why an award shifting fees should be made."  Id.
"Historically, the practice has been not to award costs and fees
as a general matter in cases falling within the purview of the
statute."  Id. at 803, and cases cited.  "[A]n award of costs
and fees by a judge in the Probate Court under § 45 may be
presumed to be right and ordinarily ought not to be disturbed"
(quotation and citation omitted).  Id. at 805.  A decision not
to award costs and fees is entitled to the same deference.

Although the brief filed by Tony, Chris, and Lisa informs
us that they included a request for fees and costs in a proposed
judgment they submitted to the judge, they have not included
that proposed judgment in the record appendix, so we are unaware
whether the fee argument that they now present to us was ever
made to the judge.  In any event, although the proceedings in
the trial court were protracted, hard fought, and no doubt
aroused strong emotions on both sides, we cannot agree with
Tony, Chris, and Lisa that Tracey's position was so groundless,
and her litigation conduct so unreasonable, that justice and
equity demanded an award of fees and costs against her.  We
therefore do not disturb the judge's discretionary decision not

to make such an award, and we deny the request by Tony, Chris, and Lisa for their attorney's fees and costs under § 45.

<u>Judgment affirmed</u>.