**Rodger M. ARST, Plaintiff,**

v.

**STIFEL, NICOLAUS & COMPANY, INC.; and Odis E. Shoaf, Jr., Defendants.**

**No. 93–1299–JTM.**

United States District Court, D. Kansas.

Jan. 17, 1997.

---

Joe Rebein and Joseph G. Matye, of Shook, Hardy & Bacon, L.L.P., Kansas City, MO, Scott C. Nehrbass, of Shook, Hardy & Bacon, L.L.P., Overland Park, KS, for Plaintiff.

Reggie C. Giffin, of Morrison & Hecker, L.L.P., Kansas City, MO, John C. Nettels, Jr., of Morrison & Hecker, L.L.P., Wichita, KS, James A. Walker, of Triplett, Woolf & Garretson, L.L.P., Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

The present litigation arises from plaintiff Roger Arst's sale of a substantial number of Physician Corporation of America stock shares in 1992. PCA was then a private corporation, and the sale was accomplished through the brokerage firm of Stifel, Nicolaus & Co. and its officer, Odis Shoaf. Shoaf found independent buyers for some of Arst's stock, but without telling Arst, he also purchased a large number of shares himself and for his family. Subsequently, PCA announced plans to go public and the stock split. There is some evidence that Shoaf had heard rumors PCA would go public, but no evidence he had inside information.

By April of 1993, the stock had tripled in market value, and Arst wrote to Shoaf and Stifel asking for the names of the individuals who had bought his stock. Shoaf and Stifel refused, notwithstanding Securities Exchange Commission ("SEC") Rule 10b–10(a)(7)(i), 17 C.F.R. § 240.10b10(a)(7)(i), which requires a broker to provide the names of purchasers upon written request. Arst then filed an action in state court, which the defendants removed here. Only then did the defendants reveal Shoaf's purchase of the stock.

Arst advanced claims for violation of disclosure rule 10b–10(a)(7)(i), breach of fiduciary duty to disclose self-dealing, breach of fiduciary duty to give fiduciary advice, and violations of SEC Rule 10b–5 and K.S.A. 17–1253. The district court granted summary judgment in favor of Stifel and Shoaf on all issues. *Arst v. Stifel*, 871 F.Supp. 1370 (D.Kan.1994). On appeal, the Tenth Circuit affirmed in part and reversed in part. 86 F.3d 973 (10th Cir.1996). The court agreed

Arst had no claim under Rule 10b–10(a)(7)(i), holding that since the written request for identity of the buyers occurred only after the sale of the stock, "there is no such causal relationship between the alleged deception by the Defendants and any harm incurred from the sale of Arst's shares." *Id.* at 977. The court of appeals also agreed that under the circumstances of the case, Arst had failed to demonstrate that Shoaf and Stifel had assumed any duty to give investment advice with regard to the PCA stock. *Id.* at 979–80.

However, the Tenth Circuit also ruled Shoaf had a duty to disclose his self-dealing, and the duty was breached. The court therefore reversed the award of summary judgment on that claim. The court also found the Rule 10b–5 and K.S.A. 17–1253 claims could survive, to the extent they were grounded on a failure to disclose the self-dealing. The court noted that by itself, the violation of the duty to disclose would not establish a violation of Rule 10b–5, since "the remaining elements for liability under Rule 10b–5—including scienter, materiality, and causation—present genuine issues of material fact for a jury." *Id.* at 981.

Following remand, the case was given its present assignment, and the matter is currently before the court on Arst's motion for partial summary judgment on the breach of fiduciary duty claim. Arst contends that while a trial on causation and breach is necessary on the 10b–5 and 17–1253 claims, no issues remain with regard to the breach of fiduciary duty claim and judgment may be awarded on the claim for the profits received by Shoaf.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The facts relating to Arst's current motion take up only a short section in the original brief in support thereof and can be summarized very briefly. The response brief by Shoaf and Stifel, on the other hand, contains a lengthy discussion of the circumstances of the case, and is generally designed to support their claim that any failure to disclose Shoaf's self-dealing was not material to Arst's decision to sell the PCA stock.

Physician Corporation of America was incorporated under the laws of the State of Kansas in 1985. On June 4, 1987, PCA made an initial public offering of its stock for $2.00 per share.

Roger Arst purchased 37,500 shares of PCA stock during the 1980s. It is not clear exactly when the purchase occurred. Arst testified he acquired the shares in 1985. The defendants cite to evidence indicating the purchase occurred in 1987. The matter does not appear to be material.

In 1990, PCA engaged defendant Stifel, Nicolaus & Co. to act as an accommodating broker for its shares. Stifel was to put together buyers and sellers of PCA stock on an unsolicited basis, charging both parties a commission. PCA advised its shareholders by mail that it had made arrangements with Stifel to accommodate the purchase and sale, and that shareholders should contact Odis Shoaf, a senior vice president of Stifel, if they wanted to buy or sell shares.

On August 18, 1992, Arst authorized Shoaf to sell all of his 37,500 PCA shares at $4.625 per share. The next day, Shoaf sold 27,390 of the Arst PCA shares to third parties, and, unknown to Arst, bought the other 10,110 shares for himself and his family. Shoaf purchased 7,010 shares for himself, 1,050 for the Shoaf trust, 1,050 for the Shoaf family trust, and 1,000 for his daughter, Susan Shoaf.

Shoaf, on behalf of Stifel, was Arst's agent for the sale and a fiduciary with respect to the matters within the scope of the agency. As a fiduciary, Shoaf owed Arst the duty to carry out the ordered sale with due care and loyalty and not to make unauthorized sales. His duty of loyalty included a duty to disclose his purchases of the PCA shares.

In response to this statement in Arst's brief, the defendants deny the existence of the duty to disclose. The denial occurs without explanation and without citation to any authority. The denial directly contravenes the finding of the court of appeals in *Arst*, 86 F.3d at 979, that such a duty existed and was breached. Even though the matter was previously presented as a motion for summary judgment by Shoaf and Stifel (with all inferences being read in favor of Arst), while the current motion is brought by Arst (with all inferences being read against him), the defendants have failed utterly to present any facts which would support a finding either of no duty or no breach.

Before buying Arst's shares for his personal account, Shoaf had previously bought 9,990 shares of PCA stock from various sources. Shoaf paid a total of $39,026.00 for the stock, as reflected in the following table.

| Date of Sale | Total Shares Sold | Shares Bought by Shoaf | Price Per Share | Total Amount Paid |
|---|---|---|---|---|
| November 7, 1990 | 6,000 | 3,000 | $2.75 | $ 8,300 |
| May 7, 1991 | 37,400 | 2,500 | 4.00 | 10,052 |
| April 21, 1992 | 15,000 | 2,490 | 4.50 | 11,332 |
| June 25, 1992 | 10,000 | 2,000 | 4.625 | 9,342 |

With the purchase of Arst's shares, Shoaf had acquired 17,000 shares of PCA stock in his personal account. Shoaf has not subsequently purchased any additional PCA stock. On one occasion before the Arst purchase, Shoaf had bought PCA stock for Susan Shoaf, paying $4.50 per share for 500 shares on April 21, 1992.

In November of 1992, PCA announced its plans to go public. On December 4, 1992, PCA stock split four for three. On March 30, 1993, PCA made a public offering at $15.25 per share. On September 16, 1993, PCA stock split 2 for 1.

Shoaf has disposed of PCA stock as shown in the following table. The Shoaf trust and the Shoaf family trust has sold all its shares (all of which were acquired from Arst). Transactions involving the trusts are shown in italics in Table 2. Finally, Susan Shoaf also has sold a substantial number of PCA shares, which transactions are shown in bold below.

Table 2

| Date of Sale | Total Shares Sold or Given | Price Per Share | Total Amount Received |
|---|---|---|---|
| June 29, 1993 | 2,666 | 27.50 | 72,876.00 |
| *June 29, 1993* | *400* | *27.50* | *10,878.00* |
| *June 29, 1993* | *400* | *27.50* | *10,878.00* |
| **June 29, 1993** | **1,033** | **27.50** | **28,163.14** |
| July 15, 1993 | 2,500 | 38.00 | 94,507.00 |
| November 11, 1993 | 7,000 | 22.7914 | 158,686.09 |
| *November 11, 1993* | *1,000* | *22.7914* | *22,576.44* |
| *November 11, 1993* | *1,000* | *22.00* | *21,789.00* |
| *November 11, 1993* | *1,000* | *22.7914* | *22,576.44* |
| *November 11, 1993* | *1,000* | *22.00* | *21,789.00* |
| **November 11, 1993** | **1,000** | **22.7914** | **22,756.44** |
| November 18, 1993 | 10,000 | 22.00 | 218,857.00 |
| November 18, 1993 | 2,000 | 22.00 | 43,669.80 |
| November 24, 1993 | 225 | 23.00 | 5,106.35 |
| November 24, 1993 | 125 | 23.00 | 2,831.00 |
| December 30, 1993 | 21 | 25.25 | 509.57 |
| December 30, 1993 | 21 | 25.25 | 509.57 |
| December 30, 1994 | 152 | 20.00 | 2,991.36 |
| September 28, 1995 | 230 | 16.375 | 3,706.39 |
| May 28, 1996 | 394 | 12.875 | 5,000.75 |

Shoaf realized $212,608.79 in profit on the sale of PCA stock attributable to his purchase from Arst. Simple interest at the rate of 10% per year from each date of sale equals $63,552.95. In addition, through the sale of PCA stock attributable to the Arst purchase, the Shoaf family trust account realized profits of $50,306.44, the Shoaf trust account realized profits of $50,306.44, and Susan Shoaf realized $56,988.84. Interest on these profits, again at 10% per year from the date of each sale, equals, respectively, $15,086.69, $15,086.69, and $17,290.21.

The average per share closing price for PCA stock during the period of September 16, 1993 (the date of the 2 for 1 stock split) to October 28, 1996 (the date of plaintiff's calculations) was $19.5128. Shoaf has retained 16,834 shares of PCA stock in his personal account. Based on the proportion of the PCA stock acquired by Shoaf from Arst in comparison to those from other persons, 6,940 of the remaining shares should be traceable to Arst's sale. At an average closing price of $19.5128, the remaining stock has a market value of $135,418.83. Simple interest at 10% per year calculated from the midpoint of the stock price measurement period equals $20,924.99.

The defendants cited evidence supporting their claim that Shoaf's self-dealing would not have been a material factor in Arst's decision to sell the PCA stock. Defendants stress Arst's experience in business and investment, pointing out he has a Bachelor of Arts Degree from Carlton College, and that in August of 1992 Arst was CEO of Goldsmith's, Inc., a closely held Kansas corporation. Arst has worked in a management capacity in the business for 27 years.

Arst made investments in rental housing, commercial office space, oil and gas leases, and one start up company. Arst frequently discussed these and other investments with his regular broker, Robert Wilkins at Prudential Securities. Wilkins believes Arst is an intelligent businessman.

Arst had previously purchased stock in a health care company, which he sold for a substantial profit. Arst told his wife he bought the PCA stock because of this experience, and that he felt comfortable with PCA management. Peter Kilissanly, the chief operating officer of PCA, told Arst in June of 1987 that PCA's strategy was to grow by acquisition and take the company public. Company officers also made public statements that they intended to take the company public.

In the late 1980s, PCA's shareholders began to pressure the company to effect a trading market or provide other means to recoup their investment. On October 13, 1989, to provide the shareholders a means of liquidating their investment, PCA offered to repurchase shares at $1.00 per share. In a prospectus accompanying the offer which Arst received, PCA stated:

> Management of the company intends to create a trading market for the Company's shares at some future point if the Company's profitability and growth permits. However, there can be no assurances that such a trading market will be established.

(Defs.' Ex. 27, Depo. Ex. 24 at p. 12.) Arst did not tender his shares in response to the offer.

Before October of 1990, no exchange or brokerage firm handled transactions in PCA stock; all transactions were handled internally by PCA's legal department. Because PCA's general counsel, John Hageman, was concerned that this situation presented potential conflicts with his possession of inside information, PCA approached Shoaf about the possibility of Stifel assisting in transactions in company stock and acting as a market maker.

Stifel declined to act as a market maker, but agreed to act as an accommodating broker on an agency basis. In this role, Stifel handled transactions on an unsolicited basis only. Stifel contends it did not make recommendations regarding the stock, and transactions were made through a letter in which the buyer or seller certified no solicitation had been made. Nonetheless, Arst cites both his own testimony, and that of Howard Berg, that Shoaf made statements about the

PCA stock which could be construed as recommendations. Shoaf denies having any access to information different from that of other PCA shareholders, and states he only transmitted the latest information on the company's financial status which he received from PCA.

In carrying out Stifel's role as accommodating broker, Shoaf would attempt to match up those interested in transactions in the stock. Communication between buyers and sellers was indirect, through Shoaf. If a sale occurred, Stifel charged a commission to both the buyer and the seller.

Shoaf began to keep a record of persons expressing an interest in PCA stock. When a person called wanting to buy or sell the stock, Shoaf would contact other persons to see if they wished to sell or buy the stock at a given price. Between October 1990 and September 1992, 23 transactions in PCA stock occurred, in which 289,750 shares of PCA stock were sold by 22 different sellers to 48 different buyers.

Arst called Shoaf on August 17, 1992 to discuss the PCA stock. The nature of this conversation, as well as a subsequent one the following day, is in dispute. According to Shoaf, Arst told him he wanted to sell his PCA stock. The defendants also cite evidence indicating Arst and his wife were in the process of purchasing a new home and needed in excess of $100,000.00 to complete the closing. It is uncontroverted that Arst's wife Patricia had written to Shoaf to inquire about the current selling price for PCA stock.

According to Arst, however, he had not at that time decided to sell the PCA stock when he spoke with Shoaf on August 17. He authorized the sale of his 37,500 shares at $4.625 per share only after a further conversation.

Shoaf told Arst he had never sold such a large amount of shares, and that he couldn't guarantee he could sell it all. At the time of the sale, Shoaf did not know whether he or his family would purchase any of the stock. Shoaf did not discuss buying the stock with his wife until he first spoke with other buyers.

Shoaf and his sales assistant, Carol Nelson, began contacting potential buyers, and by August 18 or 19, had identified persons interested in buying 19,900 shares. Shoaf did not know if he would be able to sell the remaining 17,600 shares at the $4.625 price. Shoaf purchased the number of shares identified above for himself and his family knowing it was a highly speculative transaction, but hoped there was a potential for gain. The remaining shares were sold on August 19. After commission and fees, Arst made a profit of $94,685.50 from the sale of the PCA stock.

Arst did not ask the identity of any of the buyers when the stock was sold, and Shoaf did not inform Arst of his purchase of the stock. In connection with the sale, Arst signed a nonsolicitation letter, which stated:

> The undersigned hereby certifies that the above transaction for the purchase/sale of these securities was not solicited directly or indirectly by Odis E. Shoaf ... nor was the transaction solicited or procured by the means of any communication, inducements or advertisement ... by your company.

(Defs.' Ex. 41, Depo. Ex. 39.) The letter also included a standard hold-harmless provision.

PCA had a net operating loss or $1,096,-000.00 in 1991. The quarterly performance of PCA is reflected in the following table:

Table 3

| Period (Quarter/Year) | Profit or Loss (Thousands of $) |
| --- | --- |
| 1 / 1991 | 1,892 |
| 2 / 1991 | –3,139 |
| 3 / 1991 | – 307 |
| 4 / 1991 | 535 |
| 1 / 1992 | – 387 |

According to Shoaf, he knew nothing of the intended PCA public offering until the November 2, 1992 company press release. However, Arst cites the testimony of two Wichita attorneys (Bill Cobb and Bill Dakan) that Shoaf had spoken with them in March and June of 1992 about rumors that PCA would go public.

■ The main issue before the court is straightforward: in an action under Kansas law for breach of fiduciary duty for failure to disclose self-dealing, is the plaintiff required

to show materiality and causation of the nondisclosure? Arst contends such elements would have to be demonstrated if he were seeking damages, but where the remedy sought is disgorgement of profits those elements are not required.

Arst finds support for his argument in two Kansas cases, *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210 (1974), and more particularly, *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979). In *Bessman,* the court held that an agent realizing a secret profit though his dealings with his principal forfeits any profits he would obtain as well as any right to compensation. The court reiterated this principle in *Henderson,* stating:

> In all business transactions affecting the subject matter of an agency, it is the duty of the agent to act in good faith and with loyalty to further advance the interests of the principal. *Gillies v. Linscott,* 94 Kan. 217, 219, 146 Pac. 327 (1915), and *Merchant v. Foreman,* 182 Kan. [550,] at 556 [322 P.2d 740, 745 (1958) ]. Where a fiduciary relationship is established the law views with suspicion all dealings in the subject matter of the agency to see that the agent has dealt in good faith and fairness, and that the agent has given the principal the full benefit of his knowledge and skill. If it appears the agent has been guilty of concealment, unfairness, or has taken advantage of the confidential relationship, the advantage gained will not be allowed to stand.

225 Kan. at 687, 594 P.2d 650.

Shoaf and Stifel distinguish *Henderson* on the facts. In *Henderson,* the agent had been employed to locate property for a restaurant. The agent obtained a site for $56,000.00. The site was sold to the principal, without disclosure of the markup, for $88,000.00. Shoaf and Stifel contend *Henderson* has no application here, since the agent in that case had an automatic, built-in secret profit. Here, on the other hand, the stock obtained by Shoaf from Arst could have gone either up or down in value.

The court finds the attempted distinction of *Henderson* is not appropriate. While *Henderson* may have involved a more blatant case of wrongdoing than Shoaf's, this does not mean that Arst is required to show materiality and causation. Upon reviewing the general background of the law requiring disclosure of self-dealing, the court finds Shoaf may be compelled to return any profits he realized from the sale of the PCA stock. There are several grounds for such a conclusion.

First, it should be noted that Stifel and Shoaf fail to cite any authority for the position they take: that is, so long as the "secret profit" enjoyed by the agent was contingent rather than certain, the agent cannot be compelled to disgorge the profits, and the principal is restricted to an action for damages and thus must present proof that the nondisclosure was material. The cases cited by Shoaf and Stifel, which indicate proof of causation is required, were all actions for damages as opposed to an action for disgorgement of profits.

On the other hand, the principle underlying the requirement of disclosure is one which has been consistently and vigorously supported by the courts in Kansas and other authorities. The Tenth Circuit, in *Arst,* found that Kansas, having adopted other provisions of the Restatement (Second) of Agency relating to a fiduciary's duty of loyalty, would also adopt § 389 of the Restatement dealing with the agent's actions as a potential adversary of the principal. Section 389 provides:

> Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge.

The defendants' argument that Arst must also show scienter is not supported by the Restatement. Comment a. to § 389 provides that the rule against requiring disclosure is so strong that, when violated, "such a transaction can be rescinded by the principal although the agent acts in good faith and without consciousness of wrong doing." Similarly, the defendants' argument that Arst must prove causation and damages is rejected by the Restatement. Comment c. to § 389 provides:

The rule stated in this Section is not based upon the existence of harm to the principal in the particular case. It exists to prevent a conflict of opposing interests in the minds of agents whose duty it is to act solely for the benefit of their principals. The rule applies, therefore, even though the transaction between the principal and the agent is beneficial to the principal.

The only exception to the rule against self-dealing under § 389 exists when the principal has "otherwise agreed" to the agent's activities, but such an agreement expressly requires full disclosure of those actions. See Restatement (Second) of Agency § 390. No such disclosure occurred here.

That the defendants' argument is inconsistent with the Restatement may also be seen from that authority's discussion of remedies for breach of the agent's duty. Section 403 of the Restatement is explicitly directed at violations of the duty of loyalty, specifically including violations of § 389 when the agent "purchases goods from the principal" without disclosure. See § 403, comment a. Section 403 provides:

> If an agent receives anything as a result of his violation of a duty of loyalty to a principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.

The commentary to the section explains the election available to the principal:

> The principal has a cause of action either for a breach of contract or for a tort, as a remedy for damage caused by the violation of any duty of loyalty on the part of the agent. The principal may also charge the agent with anything which the agent receives as a result of the violation of duty, its value or its proceeds. The extent to which a principal has both rights is stated in Section 407.

Restatement (Second) of Agency § 403, comment b.

Section 407(1) provides:

> If an agent has received a benefit as a result of violating his duty of loyalty, the principal is entitled to recover from him what he has so received, its value, or its proceeds, and also the amount of damage thereby caused; except that, if the viola-

tion consists of the wrongful disposal of the principal's property, the principal cannot recover its value and also what the agent received in exchange therefor.

In summary, the scheme of the Restatement supports the plaintiff's contention that, having shown a violation of the duty of loyalty in Shoaf's failure to disclose his stock purchases, he is entitled to recover any profits made by Shoaf from the transaction. This conclusion also finds support in the general treatment of the issue in prior Kansas law.

The Kansas Supreme Court has recognized as a general rule that an agent to sell may not buy for himself, and that prior to any self-dealing transaction, the principal is entitled to full information regarding the facts of the transaction. *Schuhmacher v. Lebeck*, 103 Kan. 458, 465–60, 173 P. 1072 (1918).

> "A real estate agent, who induces the owner to fix a net price upon certain property, upon the supposition that a sale is to be made to a third party, cannot himself purchase the property and by such transaction, in any event, realize a greater profit than a reasonable commission in addition to the net price."

*Schuhmacher*, 103 Kan. at 461, 173 P. 1072 (quoting *Merriam v. Johnson*, 86 Minn. 61 syl. ¶ 1, 90 N.W. 116 (1902)).

Similarly, in the early case of *Albright v. Phoenix Insurance*, 72 Kan. 591, 84 P. 383 (1906), the court concluded: "An agent will not be permitted to retain profits derived from the management of the subject-matter of his agency in violation of his duty as an agent." *Albright* syl. ¶ 1. The court also made clear the strong public policy basis underlying this rule:

> The business transactions of the world are largely accomplished through the instrumentality of agents, and the law requiring the utmost frankness and fidelity between agent and principal cannot be too vigorously sustained and enforced.

*Id.* at 594, 84 P. 383.

Another case of potential relevance is *Merchant v. Foreman*, 182 Kan. 550, 322 P.2d 740 (1958). In *Merchant*, the plaintiff sued her real estate agents for taking advantage

of her confused mental condition and fraudulently inducing her to trade her farm for an apartment of lesser value. The court took the occasion to identify some "well-established rules" relating to obligations imposed by a fiduciary relationship. 182 Kan. at 555, 322 P.2d 740. In this context, the court noted that once a fiduciary relationship has been found to exist,

> the law views with suspicion and scrutinizes very closely all dealings between them in the subject matter of the agency to see that the agent has dealt with the utmost good faith and fairness, and that he has given the principal the benefit of all his knowledge and skill, and, *if it appears that the agent has been guilty of any concealment or unfairness,* or if he has taken any advantage of his confidential relationship, *the transaction will not be allowed to stand.*

*Merchant,* 182 Kan. at 556, 322 P.2d 740 (emphasis added; citations omitted). In the subsequent case of *West v. Prairie State Bank,* 200 Kan. 263, 268, 436 P.2d 402 (1968), the court cited *Merchant* and noted that "[i]t is well settled that an agent cannot deal with the subject matter of the agency for his own profit or advantage."

Kansas has taken a strong view of a fiduciary's duty of loyalty. In *Martin v. Hunter,* 179 Kan. 578, 585, 297 P.2d 153 (1956), the Kansas Supreme Court reviewed the responsibilities of joint adventurers and concluded that such persons are bound by the duties common to other fiduciaries. In discussing the nature of this "duty of the finest loyalty," the court quoted with approval Justice Cardozo's remarks in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928):

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is

unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

*Martin,* 179 Kan. at 585, 297 P.2d 153 (quoting 249 N.Y. at 463, 164 N.E. 545) (citation in *Meinhard* omitted).[1]

Judge Saffels addressed the issue of Kansas law relating to a faithless servant in *Burton Enterprises v. Wheeler,* 643 F.Supp. 588 (D.Kan.1986). In *Burton,* a former salesman sought to obtain commissions withheld by his former employer. The employer contended the commissions had been forfeited by the salesman's acts in competing with the company, thereby violating his duty of service and loyalty. The court acknowledged the case before it did not involve the type of extreme faithlessness exemplified in the secret profits cases of *Bessman* and *Henderson.* The court concluded, however, in light of the "high standard" of loyalty established by Kansas courts, the faithless servant doctrine would not be limited to "the blatant misappropriation of funds." *Id.* at 591. The court also found persuasive the Eighth Circuit's decision in *DSG Corp. v. Anderson,* 754 F.2d 678 (6th Cir.1985). That court stated that "'an employee-fiduciary may be liable to the employer for any gain derived by establishing a competing interest without full disclosure to the employer, *even if the employer has suffered no loss.'"* *Burton,* 643 F.Supp. at 591 (quoting *DSG,* 754 F.2d at 682 (emphasis added by *Burton*). The *Burton* court concluded that the appropriate remedy for the salesman's competitive actions was forfeiture of the agreed upon commissions.

Finally, as noted earlier, the Tenth Circuit's conclusion was predicated in part on the Kansas Supreme Court's prior reliance on the Restatement (Second) of Agency as

---

**1.** The United States Supreme Court has also cited the same remarks with approval. *See Woods v. City Nat'l Bank,* 312 U.S. 262, 269, 61 S.Ct. 493, 497–98, 85 L.Ed. 820 (1941) (fiduciary must show "strict adherence" to duty of loyalty).

**1492**

persuasive authority on the duties and liabilities of an agent. *Merchant v. Foreman,* 182 Kan. at 556, 322 P.2d 740 (quoting Restatement (Second) of Agency, § 390). In addition, the Kansas Supreme Court also indicated repeated agreement with the discussion of agent responsibilities in Am.Jur. and Am. Jur.2d. *See Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, 510 P.2d 1212 (1973) (citing 3 Am.Jur.2d Agency § 206); *Kramer v. Farmers Elevator Co.,* 193 Kan. 438, 442, 393 P.2d 998 (1964) (citing 3 Am.Jur.2d Agency § 171); *Merchant,* 182 Kan. at 556, 322 P.2d 740 (citing 2 Am.Jur.Agency § 252, 254, and 260); *Shugar v. Antrim,* 177 Kan. 70, 74, 276 P.2d 372 (1954) (citing 2 Am.Jur.Agency § 349). This authority also states:

> The well-settled general rule is that without the full knowledge and consent of the principal, an agent employed to sell the principal's property may not become the purchaser of such property. The rule is so deeply grounded that no custom or private usage can override it, and it is not affected by the fact that no positive fraud or unfairness was perpetrated by the agent upon his principal. The general rule applies although the agent purchases the property at a fair market price, or at the price set by the principal, and even though he was unable to sell to anyone else at the price fixed.

3 Am.Jur.2d Agency § 236, at 737 (footnotes omitted). The same authority notes that when the rule is violated, the principal may proceed in either an action for damages, or "[i]f the principal seeks to ratify or affirm the transaction, he may accept the situation and compel an accounting for any profits which the agent has made, or, if the property has passed to a third person, he may compel a return of the proceeds or profits." *Id.* at § 240.

In addition to the Kansas cases supporting or indicating potential support for the requirement of disgorgement of profits without proof of causation, decisions from other jurisdictions also support such a rule. Most prominent among these decisions is that of the United States Supreme Court in *Robertson v. Chapman,* 152 U.S. 673, 14 S.Ct. 741, 38 L.Ed. 592 (1894). There, the Court recognized the rule that an agent to sell may not purchase the property to be sold, absent disclosure. The agent could not "directly or indirectly, become the purchaser and maintain any title as against his principal; for, in so purchasing, his duty and his interest would come in conflict." 152 U.S. at 681, 14 S.Ct. at 744. The Court also indicated the appropriate remedy for a violation of the duty, stating that the nondisclosing agent

> becomes, in respect to the property, a trustee for the principal, and, at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a bona fide purchaser, to account not only for its real value, but for any profit realized by him on such resale. And this will be done upon the demand of the principal, although it may not appear that the property, at the time the agent fraudulently acquired it, was worth more than he paid for it. The law will not, in such case, impose upon the principal the burden of proving that he was, in fact, injured, and will only inquire whether the agent has been unfaithful in the discharge of his duty. While his agency continues he must act, in the matter of such agency, solely with reference to the interests of his principal. The law will not permit him, without the knowledge or assent of his principal, to occupy a position in which he will be tempted not to do the best he may for the principal.

*Id.* at 681–82.[2]

For other cases requiring disgorgement without proof of causation, *see Ohio Drill &*

**2.** The Kansas Supreme Court has cited *Robertson v. Chapman* with approval. *See Barnett v. Dunlop,* 121 Kan. 758, 250 P. 299 (1926). In *Barnett,* the court did not apply the rule against self-dealing in the case of an agent engaged to sell the principal's property to a third party, and who subsequently bought the property himself. The court stressed the independent, good faith nature of the first sale and that the agent at that time had no "thought, much less expectation, that he would become its owner." *Id.* at 760, 250 P. 299. In contrast, in the present case Shoaf knowingly purchased the PCA shares directly from Arst in violation of the duty to disclose the self-dealing.

*Tool v. Johnson,* 625 F.2d 738 (6th Cir.1980); *Pratt v. Shell Petroleum Corp.,* 100 F.2d 833 (10th Cir.1938), *cert. denied,* 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1939); *In re Estate of Swiecicki,* 106 Ill.2d 111, 87 Ill.Dec. 511, 477 N.E.2d 488 (Ill.1985); *Smith v. Hooper,* 59 Tenn.App. 167, 438 S.W.2d 765 (1968). *Pratt* is instructive since it involved the Tenth Circuit applying Kansas law; *Swiecicki* is instructive since the profits the agent was compelled to disgorge were clearly contingent in nature rather than "built-in." [3]

In summary, the court finds the breach of Shoaf's fiduciary duty to refrain from undisclosed self-dealing prevents him from retaining any profits from that transaction. Between Arst and the defendants, the profits from the rapid increase in the PCA stock more properly belong to Arst. This is not because he has demonstrated he was damaged, but because Shoaf's retention of the profits would seriously undermine the strong proscription against undisclosed fiduciary self-dealing. As the Kansas Supreme Court stressed in *Albright,* 72 Kan. at 594, 84 P. 383, "the law requiring the utmost frankness and fidelity between agent and principal cannot be too vigorously sustained and enforced." Permitting Shoaf to keep the profits—simply because the profits were contingent rather than "built-in"—would detract from the vigorous enforcement against self-dealing.

In addition to their basic argument against Arst's disgorgement of profits claim, the defendants raise several additional arguments. The defendants argue that: (1) Arst waived any claim to profits by signing the hold harmless agreement; (2) Arst is barred from claiming the profits by equity and by failure to mitigate; and (3) the purchases by Shoaf's family should be considered separate. The court finds each of these arguments must be

rejected in light of the strong public policy underlying the fiduciary's duty to disclose.

■ Kansas law generally recognizes the validity of a hold harmless agreement or release. *Anderson v. Union Pacific R.,* 14 Kan.App.2d 342, 790 P.2d 438 (1990). However, such an action will not be enforced when contrary to public policy. *Anderson,* 14 Kan.App.2d at 345, 790 P.2d 438. And one early federal district court decision in Kansas directly held that acts of an agent which violate his fiduciary duty are not only invalid as to the principal, but are against public policy. *Stephens v. Gall,* 179 F. 938 (D.Kan.1910). Moreover, the Kansas Supreme Court has indicated a release will not be upheld where it " 'protects against fraud or relieves one of a duty imposed by law for the public benefit.' " *Belger Cartage Serv. v. Holland Construction,* 224 Kan. 320, 330, 582 P.2d 1111 (1978) (quoting 17 Am.Jur.2d Contracts § 188). A fiduciary's obligation to refrain from undisclosed self-dealing is such a duty.

■ The defendants argue Arst lacks "clean hands" and failed to mitigate his damages by failing to repurchase the stock immediately once he learned of the public offering. By that time, however, the stock had substantially appreciated in price, and as noted earlier, Arst knew nothing of Shoaf's self-dealing until after the present litigation was commenced. In comparison with Shoaf's violation of his fiduciary duty of disclosure, Arst has not been shown to lack clean hands. It is insufficient for an agent, who has profited improperly from intentional or reckless violation of his fiduciary duty by undisclosed self-dealing, to complain that his principal has been insufficiently vigilant. Moreover, the cases cited by defendants applying the obligation to mitigate, *Schraft v. Leis,* 236 Kan.

---

3. Although defendants discount the importance of the decision in *Swiecicki,* the court is unable to do so. It should be noted that the Kansas Supreme Court previously relied upon decisions from Illinois on the scope of an agent's duties. In *Bessman v. Bessman,* 214 Kan. 510, 520 P.2d 1210 (1974), the court cited with approval the decision in *Steinmetz v. Kern,* 375 Ill. 616, 32 N.E.2d 151 (1941) in support of its conclusion that an agent violating a fiduciary duty was not entitled to compensation. Particularly relevant

here is the *Bessman* court's quotation from Illinois law as stated in *Steinmetz,* that in applying the rule

it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of public policy rather than injury to the principal.

214 Kan. at 518, 520 P.2d 1210 (quoting 375 Ill. at 621, 32 N.E.2d 151).

28, 41, 686 P.2d 865, 876 (1984); *Nolan v. Auto Transporters,* 226 Kan. 176, 184–85, 597 P.2d 614, 622 (1979); *Theis v. duPont, Glore Forgan,* 212 Kan. 301, 307, 510 P.2d 1212 (1973), all appear to impose the duty to mitigate in the context of an action for damages rather than simple disgorgement of profits.

If the claim here was one for damages, Arst's failure to attempt to repurchase the stock might be considered as a failure to mitigate.[4] However, the claim which is the subject of the present motion is not an attempt to recover damages, but to remove from the agent the profits of his violation of duty. As noted earlier, the policy basis for requiring full disgorgement is removal of any temptation towards self-dealing. *Robertson,* 152 U.S. at 682, 14 S.Ct. at 745. The policy supporting the rule is not diminished when the agent obtains profits which the principal might have mitigated.

Finally, an agent violating the fundamental duty of loyalty by undisclosed self-dealing will not be permitted to evade that duty by the expedient of arranging the sale of the principal's property to a close family member. The rule precluding undisclosed self-dealing by an agent includes all indirect transactions under which the agent benefits from the transfer. *See Stark v. Starr,* 94 U.S. 477, 24 L.Ed. 276 (1876). Thus, the rule has been held to apply to transfers to the agent's spouse, *Adams v. Herman,* 106 Cal. App.2d 92, 234 P.2d 695 (1951); sister, *Abell v. Watson,* 155 Cal.App.2d 158, 317 P.2d 159 (1957); or daughter, *Perry v. Engel,* 296 Ill. 549, 130 N.E. 340 (1921). The agent is obliged to disclose to the principal any sale to a close relative. *See Mersky v. Multiple Listing Bureau of Olympia,* 73 Wash.2d 225, 437 P.2d 897, 899 (1968). As noted earlier, in *Robertson v. Chapman,* 152 U.S. 673, 14 S.Ct. 741, the Supreme Court indicated the effect of an agent's attempt to convey such property indirectly is to render himself a trustee of the property for the benefit of the principal. Accordingly, there is no bar to protect Shoaf from being required to account for the sales to the trusts and his daughter.

Consistent with findings of the court of appeals relating to duty of loyalty, this court finds Arst's disgorgement of profits element of the action is subject to judgment. In addition, the court must note the failure of defendants to controvert the amounts of profits identified in Arst's brief in support of his motion for summary judgment. There, Arst provides considerable and detailed evidence as to amounts of profit obtained by Shoaf, the trusts, and his daughter, along with interest on those profits.

In response to each of these facts, the defendants state only: "Admit that the calculations are accurate, but deny that the methodology is accurate." (Defs.' Resp. at 14.) The defendants then proceed with their own lengthy factual discussion relating to causation, without pausing to supply any reference to evidence controverting the assertions of Arst. Nowhere do the defendants provide any evidence supporting a more accurate methodology for calculating the profits to be disgorged.

The defendants clearly fail to satisfy the requirements of Fed.R.Civ.P. 56 and D.Kan.R. 56.1, which require a party disputing a movant's statement of facts to provide denials which "refer with particularity to those portions of the record upon which the opposing party relies," and provide that all facts not so denied are deemed admitted. The rules relating to the methods for contravening assertions of fact in a motion for summary judgment are important and necessary rules of justice and may not be discarded. The amount of profits to be disgorged is deemed undisputed. Accordingly, Arst has not only presented a valid basis for judgment as to the disgorgement of profits, but also demonstrated the amounts to be disgorged.

---

4. Although not controlling here, it is not clear that Arst in fact failed to mitigate his damages. Although the defendants cite evidence to show that some persons had indicated to Shoaf they were willing to sell their PCA stock in January and February of 1993, there is no indication Arst was aware of their identity or that those persons were willing to sell a substantial number of shares. Moreover, as noted above, Shoaf and Stifel were consistently, and wrongfully, refusing during this time to comply with Arst's written request for the names of the persons who had purchased his shares.

IT IS ACCORDINGLY ORDERED this 17th day of January, 1997, that the plaintiff's motion for partial summary judgment (Dkt. No. 79) is hereby granted.