**Gene DELANEY, Plaintiff,**

v.

**DEERE AND COMPANY, and John Deere Limited, Defendants.**

**No. 96–1107–JTM.**

United States District Court, D. Kansas.

Oct. 3, 1997.

John Gehlhausen, Lamar, CO, Kevin L. Diehl, Ralston, Diehl & Pope, Topeka, KS, for Plaintiff.

Larry A. Withers and Alan R. Pfaff, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for Defendants.

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

The present action arose when a large round bale fell from a John Deere front loader attached to plaintiff Gene Delaney's tractor. Delaney brings the present product liability and negligence action against the manufacturer of the tractor and front loader, alleging inadequate design and warnings.

Two motions are currently outstanding. First, Deere moves for summary judgment, largely on the grounds that warnings given were adequate and Delaney knew and understood those warnings. Second, Delaney moves to amend the complaint to advance a claim for punitive damages. The court finds it is unnecessary to address the second motion because the uncontroverted evidence clearly establishes plaintiff has failed to prove a defect or inadequate warning.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In con-

sidering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita* ).

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The uncontroverted facts submitted to the court permit the following findings of fact. To the extent additional claims of fact advanced by the parties are not included herein, it is because such claims have been found to be unsupported by admissible evidence in the record or not properly before the court pursuant to the rules relating to summary judgment motions.[1]

## FINDINGS OF FACT

Baling machinery capable of making large round bales was first introduced into the market in 1972–73. To eliminate the hazard of bale drops or rolldowns—accidents in which a bale drops from a front loader onto an operator—Deere designed, manufactured and marketed special round bale handling equipment which could be used on a model 158 front end-loader to safely move large round bales. The bale spear (sometimes called a bale spike or fork) was introduced by the 1970s; the bale clamp was introduced in 1976; and the bale hugger was introduced in 1992.

The round bale clamp uses two hydraulic arms and a hoop which swing down over the bale to hold it to the loader. The clamp can be attached to a bucket with tines, a forklift or a manure fork attachment. The loader is positioned so that the tines are under the bale and the clamp is closed to keep the bale fixed.

The bale spear or fork designed by Deere has a frame and three tines. The central tine is two inches thick and four feet long, and is used to penetrate the end of the bale and secure it for moving or stacking. The other two, 16–inch long, tines are located below and on either side of the main tine and serve to stop the bale from rotating on the main tine.

The bale hugger is an attachment made up of a frame and two horizontal arm assemblies. One arm is stationary; one pivots hydraulically. The bale is clamped between the two. The hugger allows the handling of bales without puncturing either the bale or

---

**1.** As this court has previously noted, the rules governing "the methods for contravening assertions of fact in a motion for summary judgment are important and necessary rules of justice and may not be discarded." *Arst v. Stifel, Nicolaus & Co.,* 954 F.Supp. 1483, 1494 (D.Kan.1997).

Even assuming, however, the court disregards the violations of D.Kan. Rule 56.1 manifest in plaintiff's response and considers all the various evidence cited therein, the court specifically finds plaintiff has still failed to demonstrate either a defect or inadequate warning.

the plastic wrapping which is sometimes used to cover bales.

One paramount feature of a front-end loader, manufactured either by Deere or by other makers, is its versatility. A customer can purchase one front-end loader and customize it to his own particular needs by purchasing optional attachments. At the time of the accident, John Deere offered the following attachments for the model 158 front-end loader: material buckets in 61″, 73″, 85″ and 97″ sizes; a 60″ manure fork; a silage grapple, a round bale clamp or grapple; a round bale fork or spear; a forklift, and a forklift boom. Other manufacturers' attachments for use on Deere loaders included hydraulic booms, front blades, stone buckets or rakes, brush rakes, and crane booms.

It is uncontroverted that a significant number of Deere's customers do not use the front-end loader to move large round bales and do not need special bale handling equipment. Front-end loaders are also used for moving manure, silage, grain, or stones; clearing snow; grading gravel or dirt; scraping feedlots and reclaiming land; craning heavy objects; and killing weeds with a wick boom. To preserve the general utility of the loader, Deere has never offered a bale clamp or grapple as standard equipment. Deere knows, based on its experience in marketing front-end loaders, that farmers do not want to buy multiple loaders, nor do they want to pay for equipment they will never use.

A front-end loader is not the only way to move large round bales. For example, a forklift, bale spear or hugger can be attached to a tractor three-point hitch. A self-loading bale mover can be used. Another option is use of a pickup truck with a rear-mounted bale spear.

Between 1972 and 1996, Deere made and sold 348,000 front-end loaders.

Delaney grew up on a farm, and as a result had the opportunity to do farm work. Between 1958, when he graduated from high school, to 1972, Delaney spent about five or six years farming. By 1972, Delaney considered himself an experienced, competent farmer who understood and knew what he was supposed to do. In the spring of 1990, he went back to farming as a full-time occupation and continued in the farming business full time until his accident in 1995.

Delaney started using a John Deere 4020 tractor in 1971; he purchased the tractor in 1978. He purchased the subject John Deere front-end loader new in 1979.

The "SCV" or hydraulic control valves on the tractor are used to power the front-end loader and its attachment. Delaney described operating the SCV lever in his deposition:

Q. ... To raise the loader you pull the outside lever, the tallest lever, to the rear, do you not?

A. That's true.

Q. And to lower the loader you push the outside lever forward, do you not?

A. Yes, sir.

Q. Are you familiar with the term detent?

A. Yes, sir.

Q. What do you understand that word to mean?

A. When the lever is in full back position, the loader would raise until it reached the top and then it would come back to neutral.

. . . .

Q. If you pull the lever all the way back as far as it will go rearward—

A. (Witness motioned head affirmatively.)

Q. and let go of the lever, what will it do?

A. If you pulled back as far as it possibly will go, it will stay in a raised position until the cylinders are fully extended.

. . . .

Q. Now, does the center level control the tilt on the bucket?

A. Yes, got the tilt.

Q. And when you want to change the posture of the bucket by tilting it down in the front or tilting it up in the front, how do you do that with the lever?

A. Forward, tilt it down to dig. Back to lift it up.

Q. And there is a range of travel or motion of that bucket such that it can be

**1012**

tilted so far downward and so far upward?

A. Yes, sir.

Q. And can you change that tilt on that bucket at any time you want to?

A. Yes, sir.

(Delaney Depo. at 44–45; 50–51.)

In the five years before the accident, Delaney usually used a fork on the back, three-point hitch of the tractor to move large round bales. He would back up to the bale, push forward on the control lever to drop the three-point hitch down so the fork would go under the bale, back under it, and pull back on the control lever lifting the bale. Delaney was not aware of any danger to the operator from using this method of moving large bales.

During the same period, Delaney sometimes moved large bales, using the front-end loader. He did this by removing the original loader bucket and attaching a homemade fork. This fork has two prongs that are four to two and a half feet long.

When Delaney used this procedure, he would pull up to the bale, pick up the bale by moving the fork under it from the end, lift it up a foot or two, then transport the bale. When asked whether he had ever, prior to the accident, picked up a bale with the front fork from the side rather than the end, he testified, "I'm sure I did."

Before the accident, plaintiff had occasion to stack large round bales, and in order to do so raised the bales "maybe the height of a bale," because he built a wind break along the side of his corral. On that occasion, be borrowed a neighbor's tractor/loader with a grapple. Delaney testified he used the neighbor's grapple-equipped tractor because he was raising the bales higher and "didn't want it to roll down."

Q. What would happen if it rolled down the loader arms?

A. Could smash you.

Q. And so that was a danger that you understood at the time that you decided to use a grapple instead of the forks?

A. It could happen.

Q. You understood the danger, didn't you?

A. Could happen, yes.

(Delaney Depo. at 73.) By using a grapple attachment, Delaney avoided the risk of the bale rolling down the loader arms.

Delaney knew Deere made "grapple forks" and he could have purchased such equipment had he wanted to.

A warning decal was clearly visible on the frame of Delaney's loader. The decal was on the loader the day Delaney received it. The decal stated:

## WARNING

### To Prevent Bodily Injury

1. Do not handle round bales with loader unless special John Deere round bale clamp is installed. Without clamp, bale can fall on operator when loader is raised.

Delaney is sure he read the warning label when he got the loader. He was able to understand it. He testified:

Q. Did you or did you not understand what a round bale clamp was as of the time you read this decal for the first time?

A. Yeah, but I didn't—they didn't—I didn't call it a clamp, I called it a grapple, but, yes, it's a bale clamp.

Q. Did you or did you not understand what a round bale clamp was at the time you first read this decal?

A. Yes.

Q. Did you understand they were telling you that without the clamp, the bale can fall on the operator when the loader is raised?

A. Yes.

Q. Anything about that that you didn't understand?

A. No.

(Delaney Depo. at 98–99.)

Delaney knew the loader came with an operator's manual and that it contained important information. He testified he did not

get an operator's manual to the best of his knowledge. He acknowledged he could have obtained one and read it.

The operator's manual for the Deere loader provides:

1. Improper use of front-end loaders to handle round bales can result in injury to the tractor operator from:

   a) the bale rolling back down the loader boom into the operator station.

. . . .

**CAUTION: Exercise extreme caution when using a front-end loader to handle round bales. Be careful and prevent bodily injury.**

2. Even when using proper equipment, handling round bales can be hazardous. Follow the instructions shown in this manual and on the decals attached to the loader and round bale clamp.

3. Do not handle round bales with the loader unless the specially designed John Deere round bale clamp is installed. Without the clamp, the bale can fall on the operator when the loader is raised.

Delaney recognized that if a round bale were to fall on an operator, he would expect the operator to be seriously injured or killed.

On the day of the accident, Delaney's method of loading bales was to approach a bale and stop, lower his fork, and slide the fork under the bale. He did not pick up the bales from the end, but would run the fork in under the round side of the bale. After picking up the bale with the front fork, he would raise it just high enough to clear the ground a foot, a foot and a half, or two feet at the most.

Delaney pulled up to one bale, pulled in against the round side of it, dropped his fork down, slid the fork under the bale, tilted it back, lifted it up, and proceeded. He tilted the fork back as far as it could be tilted back. He raised the loader about a foot or foot and a half, just enough to clear the ground and still allow him to see over it.

Delaney testified he

swung in kind of behind the old house, to the east edge of it like that, backed in, backed in and dropped the front—backed in and dropped the back one off. And that's when the accident happened. There was a piece, I believe, of old stone post laying there that I backed over. After that, I really don't—I really didn't remember for a little bit what I had done. I had to have stopped the tractor and clutched it because it was stopped and in neutral. The three-point was down, so I evidently had let the three-point down, had let it down. And then from that point is when I felt a burning in my face and looked around and my loader was clear in the air and my—I knew what had happened. I knew that I had dropped that bale, that it had come down.

(Delaney Depo. at 142–43.) Delaney did not see the loader go up.

Don Barry, an assistant of plaintiff's expert, John Sevart, inspected Delaney's tractor/loader and tested it on November 12, 1996. He did not find any abnormal function in the controls or hydraulics. He did not find that the loader would raise by itself without activating the controls.

Sevart testified:

Q. Is it your opinion in this case that the loader raised the bale by itself without Mr. Delaney activating the control lever?

A. No.

Q. Do you believe in order for the loader to have raised to the point where the bale could roll down the loader arms it was necessary for Mr. Delaney to move the control lever down?

A. Yes.

Q. And would he have had to move it to the rear?

A. Yes.

Q. And is that what you think he did?

A. Close.

. . . .

Q. What is [it] that you would say happened?

A. I believe it is most probable that he inadvertently got the lift control in the detent position.

Q. And how would you do that inadvertently, given what he describes that he was doing at the time?

A. There are two ways. But the most likely way is simply to pull the control back to achieve the desired height of one and a half to two feet and inadvertently pull the control back too far so it stayed in the detent position permitting the load to continuously lift. The other possibility is that he simply made inadvertent contact with the lift control when he went over this rock.

(Sevart Depo. at 54–55.)

Delaney testified the loader never had previously malfunctioned, and never had raised or lowered itself or changed its tilt without activation of the controls.

Sevart identified four alternative designs which he states are technically and economically feasible for the Deere tractor/loader: (1) a four-post rollover protective structure (ROPS) and seatbelt; (2) a two-post ROPS with a structural canopy and seatbelt; (3) a bale guard attached to the loader arms that would provide protection for the operator if a large object fell from the loader; or (4) a continuous, passive, self-leveling mechanism for the loader.

Severt admits in his deposition that the self-leveling device would not eliminate the hazard of bale drop or rolldown. In his opinion, it reduces the probability of such an event. He does not believe such a device alone would be an adequate design alternative. In his opinion, the tractor violated industry standards because it did not incorporate a ROPS. In his opinion, the loader violated industry standards because (1) it was technically and economically feasible to have self-leveling loaders in 1979, and (2) it was technically and economically feasible to offer a "bale loader" that would have had the bale clamp as standard equipment in 1979. Severt believes the warnings on the tractor and loader are inadequate because the warnings do not suggest the need for operator protection in the form of ROPS and do not warn that the bale can raise unexpectedly

high, "hanging in detent." (Sevart Depo. at 111–12.)

Sevart's "ultimate opinion" was that

independent of how the load got too high, an appropriate operator protective system, as I have described several times today, would have prevented his injuries, and that there is a direct analogy between preventing the injuries in this accident with safety glass in an automobile. Safety glass in an automobile doesn't prevent the accident, it doesn't—it protects the careless driver just as well as it does the uncareless driver, but is placed there in the automobile because of foreseeability of accidents occurring; and, therefore, my position as a design engineer is versed on designing operator protective systems. It doesn't matter how the load got too high; it is foreseeable that the load can get too high. It could be intentionally, it could be done accidentally. The important thing is it is foreseeable it can get too high, and if it does, the load can fall and cause serious harm; therefore, the operator should have been protected.

(Sevart Depo. at 140–41.)

Exhibit 4 is a list of claims made against John Deere arising out of bale drop/rolldown accidents.

### CONCLUSIONS OF LAW

Historically, a manufacturer has a duty under Kansas law to use reasonable care in designing its products so that they will be reasonably safe for their intended use. *Garst v. General Motors Corporation*, 207 Kan. 2, 19, 484 P.2d 47 (1971). A manufacturer also has a duty to warn the user of a product of a dangerous condition in that product. K.S.A. 60–3305 (manufacturer's duty to warn or protect against danger); *Long v. Deere & Co.*, 238 Kan. 766, 774–75, 715 P.2d 1023 (1986); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 409, 681 P.2d 1038, 1057, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *see Deines v. Vermeer Mfg. Co.*, 755 F.Supp. 350 (D.Kan.1990).

With the adoption of the Kansas Product Liability Act (KPLA), all product liability actions, whatever the nature of the underly-

ing legal theory, were consolidated. *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299 (1993). In *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 126, 795 P.2d 915 (1990), the court stated:

The product liability act applies to all product liability claims regardless of the substantive theory of recovery. Therefore, under K.S.A. 60–3302(c), the provisions of the Act apply to actions based on strict liability in tort as well as negligence, breach of express or implied warranty, and breach of or failure to discharge a duty to warn or instruct.

In the present case, Deere's motion is predicated first on the last subsection of one portion of the KPLA, K.S.A. 60–3305. This statute provides:

In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend:

(a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances;

(b) to situations where the safeguards, precautions and actions would or should have been taken by a reasonable user or consumer of the product similarly situated exercising reasonable care, caution and procedure; or

(c) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

In response, the plaintiff first argues that even if it is applicable, K.S.A. 60–3305(c) only eliminates Deere's duty to warn of the dangers of a bale rolldown; it does not eliminate

the duty to design against such accidents. The text of the statute, however, contradicts this argument. By its own terms, the statute provides that when its stated conditions are met with adequate warnings, the defendant has neither a duty to warn or to protect against dangers. This was the understanding the court took of the statute in *Olson v. U.S. Industries, Inc.,* 649 F.Supp. 1511 (D.Kan.1986), where the court found that the KPLA "provides that the duties of a 'manufacturer' do not include warning *or safeguarding* against patent, open or obvious risks which a reasonable user should have realized." 649 F.Supp. at 1517 (emphasis added).

Applying K.S.A. 60–3305(c) the court finds summary judgment is I appropriate under the facts of the case. Here, it is undisputed that Delaney had seen the warning attached to the front loader. Delaney ignored the warning. He knew of the danger of bale rolldowns in the event the loader was lifted too high. Delaney knew special equipment was available which would eliminate that risk. On occasion, Delaney used such special equipment. This is thus not a case where the defendant is relying on the mere obviousness of a danger to establish constructive knowledge on the part of a plaintiff. Here, the uncontroverted facts establish that the plaintiff had actual knowledge of the danger of a bale rolldown.

The plaintiff attempts to change the focus by stressing that he was not aware of the danger of a bale rolldown when he was merely transporting bales without lifting them more than a foot and a half off the ground. But the uncontroverted evidence also establishes that Delaney knew how the detent feature of the loader worked. Despite the plaintiff's recent attempt to suggest that the loader may have raised itself without operator input, this is clearly without any evidentiary support. Plaintiff's expert admitted in his deposition that the loader would not lift without operator input. A study conducted for the plaintiff's expert failed to find any defect in the loader which would cause such unexplained raising of the loader.

Deere's motion is also predicated on Restatement (Second) of Torts, § 402A, comment j, which provides:

Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

The plaintiff contends comment j has been rejected in Kansas, and cites the decision of the Tenth Circuit in *Wheeler v. John Deere*, 862 F.2d 1404 (10th Cir.1988). It is true in *Wheeler* the Tenth Circuit rejected an argument by a defendant that the trial court should have given an instruction premised on comment j. But this was *not* because the court concluded that comment j was antithetical to Kansas law. Instead, the court merely found that the remainder of the instructions effectively incorporated the substance of comment j. The court stated:

Once again, however, Deere fails to read the instructions in their entirety. Instruction eleven specifically instructs the jury that "a product is not 'unreasonably dangerous' when its degree of danger is obvious and generally known or recognized; nor is it 'unreasonably dangerous' if the manufacturer has given adequate warnings ... that sufficiently alert the user to the risk of danger in using the product." Rec. vol. I at doc. 62. Similarly, instruction fifteen informs the jury of the user's "duty to use a product in accordance with adequate instructions and warnings." Rec. vol. I at doc. 62. These two instructions read together sufficiently comply with Kansas law on the duty to warn. *See Brooks v. Dietz*, 218 Kan. 698, 545 P.2d 1104, 1108 (1976) (adoption of § 402A).

862 F.2d at 1413. Thus, if anything, the *Wheeler* decision supports application of comment j to the present case.

Here, the uncontroverted evidence establishes that Delaney ignored warnings given by Deere. Delaney has admitted the warning attached to the loader was "clearly visible" and that it was possible to comply with the warning's terms. The evidence also establishes that had those warnings been followed and Delaney had used the specialized bale clamp, the risk of a bale rolldown would have been completely eliminated.

The plaintiff argues the warning given was inadequate; the court finds it difficult to find any deficiency. There is no indication the warning was not visible (indeed, Delaney admitted it clearly was); no indication the terms of the warning were not within consumer understanding; no indication that consumer compliance with the warning was impractical. The plaintiff also argues the warnings given could have warned specifically of additional matters such as the absence of falling object protection or the absence of a self-leveling mechanism. But the evidence

establishes that Delaney either knew of these dangers or the alternatives proposed are, in fact, less effective than the directive contained in the actual warning. Moreover, the absence of additional warnings is little proof of inadequacy where the evidence establishes that Delaney simply ignored the warning which was given.

In the end, it appears plaintiff has failed to demonstrate a defect in the loader/tractor. Although plaintiff spends a great deal of time arguing that his knowledge of the warning is merely a matter of comparative fault, this ignores the consolidation of actions under the KPLA. That is, while comparative fault or consumer misuse might be an additional defense under Kansas law, that law also requires as a prerequisite proof of a defect. *See Siruta v. Hesston*, 232 Kan. 654, 659 P.2d 799 (1983). Here, the warnings given by Deere are adequate as a matter of law, and accordingly, Deere's motion appears valid under K.S.A. 60–3305(c) and comment j.

Delaney admitted he knew of the danger of bale rolldowns, and admitted seeing and understanding Deere's warning. Had the directions in the warning been followed, it is uncontroverted the risk of rolldown would have been completely eliminated. The court finds summary judgment appropriate with respect to all claims, however denominated, advanced by plaintiff.

IT IS ACCORDINGLY ORDERED this 3rd day of October, 1997, that the defendant's motion for summary judgment (Dkt. No. 54) is granted; the plaintiff's motion to amend pleadings (Dkt. No. 47) is denied as moot.